# EXHIBIT F

O7OKDUMO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DUMBO MOVING & STORAGE, INC.,

4             Plaintiff,

5             v.                           22 CV 5138 (ER)

6  PIECE OF CAKE MOVING & STORAGE
   LLC,
7                                          Oral Argument

8             Defendant.

9  ------------------------------x
                                           New York, N.Y.
10                                         July 24, 2024
                                           11:30 a.m.
11
   Before:
12
                       HON. EDGARDO RAMOS,
13
                                           District Judge
14
                       APPEARANCES
15
   ACKNOWLEDGEIP P.C.
16      Attorneys for Plaintiff
   BY:  PAUL D. ACKERMAN
17
        -AND-
18
   TURMAN LEGAL SOLUTIONS PLLC
19 BY:  STEPHEN E. TURMAN

20 MORRISON COHEN, LLP
        Attorneys for Defendant
21 BY:  FRED H. PERKINS
        ALLISON O'HARA
22      JACQUELINE A. STEINBERG

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O7OKDUMO

1            (Case called; appearances noted)

2            THE COURT:  Good morning to you all.

3            This matter is on for a conference.

4            Is this the first time that I've seen you folks in

5   person in this case?

6            MR. PERKINS:  It is, your Honor.

7            MR. ACKERMAN:  Yes, your Honor.

8            THE COURT:  Good to see all of you.

9            MR. TURMAN:  Same to you, your Honor.

10           THE COURT:  This matter has been around for a little

11  bit.  I know there have been specific issues regarding

12  discovery that the parties wanted to raise, but, Mr. Ackerman,

13  if you're going to be speaking on behalf of Dumbo, why don't

14  you tell me, generally speaking, where things are.  What is the

15  posture?

16           MR. ACKERMAN:  The posture is frustratingly stalled,

17  your Honor.  The parties have not meaningfully exchanged

18  discovery yet.  Each side has developed -- we've developed an

19  ESI protocol, we have done the searching, documents are being

20  reviewed for production.  They're going to be relatively

21  voluminous.  There was quite a bit of e-discovery in this case.

22           The source code has not been exchanged, largely due to

23  defendants' objections regarding the scope of the definition of

24  "trade secrets."  So, I was talking to defendants' counsel as

25  we entered, and we will be submitting a motion to amend the

O7OKDUMO

1    scheduling order because it calls for depositions to be done by

2    July 31st, and we both agree that that's just not possible.

3        THE COURT:  So, am I to understand that no document

4    discovery has been exchanged as of yet?

5        MR. ACKERMAN:  That's correct, your Honor.

6        THE COURT:  When was this case first filed?

7        MR. ACKERMAN:  It was filed in 2022.  It was the

8    subject of a motion to dismiss and an amended complaint.  In

9    earnest, we had a protective order as of November of this year,

10   and started working -- we were actually working before that on

11   e-discovery protocol, which was quite the undertaking in

12   itself, and we've been moving forward, just not as quick as, I

13   think, anybody would like.

14       THE COURT:  Okay.

15       November of last year?

16       MR. ACKERMAN:  Yes.

17       THE COURT:  So, tell me what the holdup appears to be

18   now.

19       MR. ACKERMAN:  The holdup at this point, with respect

20   to source code — and that will lead to expert discovery and

21   other discovery — is the present motion.  The holdup on

22   documents, from the perspective of plaintiffs, is just the

23   volume and the review of the ESI protocol, and the search terms

24   provided by defendants pulled in over 200,000 documents, which

25   we are in the process of reviewing.  And we're going to get a

O7OKDUMO

1   rolling production going as soon as practicable, but it's just

2   the volume of ESI that's causing the problem.

3           THE COURT:  Okay.  But you can go forward with those

4   productions separate and apart from the source code issue,

5   correct?

6           MR. ACKERMAN:  We believe so, yes, your Honor.

7           THE COURT:  Okay.

8           And Mr. Perkins?

9           MR. PERKINS:  Yes, your Honor.

10          In terms of the general scheduling of the case, or

11  would you like me to address the --

12          THE COURT:  Yes.  Do you disagree concerning

13  Mr. Ackerman's representation as to where we are?

14          MR. PERKINS:  I think that is generally correct.  On

15  behalf of my clients, we are probably within a week away of

16  being ready to produce documents.  We served a request on

17  plaintiffs earlier, so we would expect that they would produce

18  documents first, but we're ready to produce documents.

19          In terms of source code, it was my understanding, your

20  Honor, from your prior ruling on April 9th, that the plaintiffs

21  were obligated to provide their theory of the case first,

22  before defendants provide their documents.  And that was, in

23  large part, because of the concern that the plaintiffs would

24  mold their theory of their case, their trade secret theory,

25  around whatever documents the defendants provide and their

O7OKDUMO

1    operating system.

2            So, we have been waiting for the plaintiffs.  They

3    provided a disclosure, which, for the reasons that I

4    articulated in my letter to your Honor — and I'm prepared to

5    address today — is still insufficient, but they have not

6    produced their source code, which, at least as I understood

7    your Honor's direction, you had said they should produce

8    materials that support their theory of the case before the

9    defendants produce their documents.

10           So, we are waiting on them.  So, in that regard, I do

11   disagree with Mr. Ackerman, but there has not yet been any

12   meaningful production of either source code or documents.

13           THE COURT:  And remind me, did I direct them to

14   provide you with their theory of the case and supporting

15   documents, or did I direct them to provide you with their

16   theory of the case?

17           MR. PERKINS:  It was more the latter, just the theory

18   of their case, but what you also directed was that we should

19   serve, the defendants should serve, interrogatories explicitly

20   requesting information regarding the trade secret

21   identification.  The following day, April 10th, we served those

22   interrogatories.  We received responses on June 4th,

23   interrogatory responses, which were three weeks late.  While

24   normally I would have given an extension, had the plaintiffs

25   asked for one, but they never asked for an extension, and

O7OKDUMO

1    that's just relevant insofar as their responses are littered

2    with their objections, all of which, I believe, have been

3    waived under applicable law because they were untimely.

4           And that brings us to the adequacy of their responses,

5    which I'm happy to address whenever your Honor wishes.

6           THE COURT:  Let me just turn to Mr. Chiu.

7           Did you have any different view as to the status of

8    where we are?

9           MR. CHIU:  We do not, your Honor.

10          THE COURT:  Okay.

11          So, I directed the plaintiffs to provide you with

12   their theory of the case.  They did so.  You filed

13   interrogatories, you served interrogatories.

14          They responded?

15          MR. PERKINS:  They responded, but, in our view,

16   inadequately.

17          THE COURT:  Okay.  And they were late.

18          So, Mr. Ackerman, first of all, why did you file them

19   so late?

20          MR. ACKERMAN:  Approximately two weeks before we

21   filed, we did advise opposing counsel that the substantive

22   responses were still being worked on between counsel and the

23   experts and we would be serving them shortly.  Granted, we did

24   not, within the 30 days, request a formal extension, but the

25   responses were provided with the objections.  Technically, we

O7OKDUMO

1     should have provided the objections and said the responses are

2     still being worked on — that was our oversight — but we did

3     provide very detailed interrogatory responses that we believe

4     fully conformed with your Honor's order to identify our trade

5     secrets with particularity.

6              THE COURT:  Mr. Perkins, is he wrong?

7              MR. PERKINS:  He is wrong on the issue of whether the

8     responses stated fair trade secrets with reasonable or

9     sufficient particularity, and I am happy to address that now,

10     if you'd like.

11             THE COURT:  Yes, yes.

12             MR. PERKINS:  I don't know if your Honor has a copy of

13     the unredacted version of the interrogatory responses.  We have

14     copies for your Honor --

15             THE COURT:  Yes, why don't you hand them up.

16             By the way, there is a protective order in this case?

17             MR. PERKINS:  There is.

18             THE COURT:  So that's not an issue with respect to the

19     discovery?

20             MR. PERKINS:  Correct.

21             I also have, your Honor, a copy of a comparison that

22     my associate prepared that compares the disclosures, the

23     textual disclosures, in the responses of the plaintiffs and

24     their interrogatories to the text of the trade secret as

25     described in the second amended complaint, which I think may be

O7OKDUMO

1    enlightening to the Court because you'll see there is a

2    substantial overlap between what's in the second amended

3    complaint and what's in the interrogatory responses that have

4    now been labeled restricted, confidential, source code

5    material.  And what is new is not very informative.

6         THE COURT:  So, ordinarily, it's a good thing when the

7    documents support the allegations in the complaint, but you're

8    saying that because there's a lot of overlap, then they clearly

9    haven't given you the secret stuff.

10        MR. PERKINS:  Exactly, your Honor.  And if they have

11   given us the secret stuff, then their secret is out because it

12   was largely what was in the complaint.

13        THE COURT:  Okay.

14        MR. PERKINS:  So if I may hand this up?

15        THE COURT:  Sure.

16        MR. PERKINS:  And for the record --

17        THE COURT:  I don't want to get too, too far into the

18   weeds, but before we deal with this, perhaps an easier issue to

19   deal with has to do with whether plaintiffs should provide a

20   2018 version of the source code versus the current, which, I

21   believe, you indicate is what you've been provided with?

22        MR. PERKINS:  Well, we have not been provided with any

23   source code yet.  I believe the screen displays -- there were a

24   couple of screen displays in the interrogatory responses, and

25   those appear to be dated in April or May of 2024.  I have not

O7OKDUMO

1    heard from the plaintiffs exactly when the source code that

2    they have not yet produced dates from, but they have indicated

3    it does not date from 2018, which is the date that they claim

4    the misappropriation by my clients occurred, nor does it date

5    from 2020, which is the date that they assert Mr. Plokhykh

6    ceased to have access to the alleged trade secret software.

7             THE COURT:  Okay.

8             Now, I am not particularly technically competent,

9    Mr. Ackerman, but isn't the relevant source code, the source

10   code that was stolen, if such it was, in 2018?  And do you

11   object to turning over that version of the source code?

12            MR. ACKERMAN:  Well, certainly, the 2018 version is

13   relevant, but not for defining the specificity of the trade

14   secrets, which could be defined fully apart from the source

15   code if we could do that with reasonable particularity.

16            Our position is that the source code that was used to

17   identify the directories and files, which was the archived

18   version of 2023, does identify the asserted trade secrets with

19   particularity.  To the extent there were any changes from 2018

20   to 2023 in the source code from our client, that would actually

21   help the defendants because we would be pointing to something

22   that shouldn't be in their code if it was developed after the

23   code was stolen.  We believe that, except for maintenance of

24   the code, that's not going to be the case.

25            Our only objection to providing the 2018 code,

O7OKDUMO

1    your Honor, is that at this moment, we still do not have it.

2    The source code was developed by a developer in the Ukraine.

3    The lead developer was killed in action, and the version of the

4    code we have was one that was turned over to another developer

5    to maintain the code in 2023 prior to that gentleman dying in

6    the line of duty.

7         So, we do have a challenge getting the 2018 code, but

8    we don't believe that that impairs our ability to define what

9    our trade secrets are and establish them with reasonable

10   particularity.  If anything, it just becomes a matter of proof,

11   and if our code moved and theirs didn't, then we're going to

12   have the egg in our face because our trade secrets are not in

13   their code.

14        THE COURT:  So, let me just see if I can get to the

15   bottom of this.

16        So, the developer of the code at issue was a gentleman

17   in Ukraine, who perished in the current war?

18        MR. ACKERMAN:  Correct, your Honor.

19        THE COURT:  But you have some information that that

20   code was somehow transferred to another individual?

21        MR. ACKERMAN:  It's being maintained by another

22   software development company, yes.

23        THE COURT:  Okay.

24        And are you in touch with that software development

25   company?

O7OKDUMO

1           MR. ACKERMAN:  Yes, we are.

2           THE COURT:  And are they able and willing to provide

3     you with the information that you need?

4           MR. ACKERMAN:  Well, we have the code as it existed in

5     2023, and that's the version that we are able to produce today.

6     We are still trying to find some way of obtaining an earlier

7     archived version to satisfy --

8           THE COURT:  Where would you find that?  Is that also

9     in the Ukraine?

10          MR. ACKERMAN:  It's going to be on some server

11    somewhere accessible by the people in the Ukraine, if there is

12    a person who still has that access.

13          THE COURT:  Okay.

14          And let me ask you, so far as you are aware, is

15    someone on that?

16          MR. ACKERMAN:  We have been looking into it, but we

17    have been hitting dead ends.

18          The other option is that we believe that that 2018

19    source code was taken by Mr. Plokhykh, and discovery from

20    Mr. Plokhykh will reveal that 2018 version as well, your Honor.

21          THE COURT:  Okay.  So, the bottom line is you don't

22    have it to give?

23          MR. ACKERMAN:  I do not have it to give at this

24    moment.

25          THE COURT:  And you are undertaking diligent efforts

O7OKDUMO

1    to obtain it?

2              MR. ACKERMAN:  As diligent as we can in a war zone,

3    yes, your Honor.

4              THE COURT:  I suppose I'm not going to require you to

5    go personally.

6              MR. ACKERMAN:  I would demur; thank you.

7              THE COURT:  So what about that, Mr. Perkins?  Does

8    that --

9              MR. PERKINS:  Well, I think we are all saddened by the

10   death of anyone in the Ukrainian war, including one of the

11   developers in this case.  Naturally, we'll accept whatever

12   version the plaintiffs are willing to produce, with a

13   reservation of rights regarding their inability to produce the

14   version that we believe is at issue in this case.

15             THE COURT:  Okay.

16             And, Mr. Chiu, I guess I am not going to require you

17   to — unless you know, one way or the other — put on the record

18   whether or not Mr. Plokhykh took the 2018 version of the

19   software when he left Dumbo.

20             MR. CHIU:  Your Honor, we responded to their discovery

21   requests asking for copies of the source code.  We told them

22   expressly that our client, my client, Mr. Plokhykh, was just a

23   sales agent for IT Dev, which is the employer of the developer

24   who developed the code at issue, and we've never had a copy of

25   it, and we don't have copies of it in our possession.

O7OKDUMO

1      It's not a copy of a source code; it's a bunch of

2 files maintained in a room server someplace.  I am not

3 technically savvy either, your Honor, so I cannot -- but what

4 was represented to me was that it's not like a compact disk

5 that we grew up with, and he just puts it in his pocket.  It's

6 not like that.  It's very complex source code, it was

7 maintained by the employer of the developer who developed the

8 source code at issue, and we do not have it, your Honor.  We've

9 never had it.

10      THE COURT:  Again, let me just ask another prefatory

11 question.

12      This program that we're fighting about, it has to do

13 with moving companies.  Why isn't this an off-the-shelf

14 product?  What's so particular about this program that was

15 developed by Dumbo?

16      MR. ACKERMAN:  Well, my understanding, your Honor, is

17 that back in 2016 --

18      THE COURT:  And it's a scheduling program, right?

19      MR. ACKERMAN:  Well, it's a fully end-to-end

20 integrated software package that pretty much does all the

21 functions required by a moving company, from receiving quotes,

22 to dispatch, to scheduling multiple jobs, to coordinating

23 storage and moving.  It seems like it's a simple endeavor, but

24 moving is now a logistics enterprise, not just two bald guys

25 with a big truck.  So the software is actually --

O7OKDUMO

1          THE COURT:  Actually, that's my experience, but --

2          MR. ACKERMAN:  Well, behind those two guys with the

3   big truck is a lot of logistics that are going on unless it's

4   just a small company.  But the software is complex, but still,

5   as complex, will fit on an encrypted thumb drive.  It's

6   structured software, so it's hundreds of directories with

7   thousands of files that link to each other by the instructions

8   in the code, but it is not an impossible task that Mr. Plokhykh

9   could have taken it, as we suggest.  It literally would fit on

10  a thumb drive if you copy the top level directory onto that

11  drive.

12          THE COURT:  Okay.

13          Mr. Perkins?

14          MR. PERKINS:  Your Honor, I think your question goes

15  to the heart of the issue before you today, which is why is

16  this program an alleged trade secret.  And as your Honor

17  probably is well aware, the DTSA, Section 18 U.S.C. 1839,

18  states that the trade secret "must derive independent economic

19  value, actual or potential, from not being generally known to,

20  and not being readily ascertainable through proper means by,

21  another person who can obtain economic value from the

22  disclosure or use of the information."

23          So, at the heart of our concern here is Dumbo has

24  failed to make any attempt in this interrogatory response to

25  distinguish what it claims are its trade secrets from publicly

O7OKDUMO

1    known information, from off-the-shelf software programs as they

2    existed, whether it's back in 2018 or 2020 or 2023.  And that

3    is, as the plaintiff recognized in their interrogatory

4    response, their burden.  They say, "This rog is straight from

5    the definition in the statute" and "it is ultimately our

6    burden."

7          While it is their burden — and they have acknowledged

8    that — there is nothing in their interrogatory response that

9    says, oh, our software program, which admittedly uses open

10   source code bases — and they claim that's okay because it's a

11   configuration of publicly available materials — but there's

12   nothing in their interrogatory response that says, this is the

13   trade secret.  Yes, we're using publicly available materials,

14   yes, we're using open source code, but we put it together in

15   some unique way that makes it a trade secret, and it's unlike

16   this program, and it's unlike that program, and nothing like

17   this was available because we can distinguish it from all of

18   the publicly available materials at the time.

19          THE COURT:  Well, this configuration was not

20   available.

21          MR. PERKINS:  Correct, but they haven't shown how

22   their configuration was not available and why their

23   configuration is different from what was publicly available.

24   And that is the biggest fundamental problem with their

25   disclosure.  Basically what their disclosure is, is

O7OKDUMO

1  functionalities, a list of 12 functionalities, most of which

2  has been disclosed in their amended complaint.  Four of the

3  twelve alleged functionalities are virtually identical to what

4  was in the amended complaint.  And I will refer you to the

5  chart, which I have handed up to the Court.  If you look at

6  item E, the customer relationship management feature; item F,

7  the seamless integration of data; item H, the seamless online

8  payment system; and item I, the automated payroll processing

9  system, their description, but for a couple of additional words

10  in the note in item E, and then item H, a couple of identical

11  words, is identical to what's in the second amended complaint.

12       So how this could be an adequate, reasonably

13  particularized description of their trade secret eludes me,

14  especially when they have not made any attempt to explain how

15  an integration of data related to storage and moving was

16  different from what was available publicly or --

17       THE COURT:  Maybe it's just that simple, right?

18       Was it you, Mr. Ackerman, that used the Kentucky Fried

19  Chicken example?

20       MR. ACKERMAN:  Yes, your Honor.

21       THE COURT:  Okay.

22       And as he indicated, there is a secret — whether we're

23  talking about Kentucky Fried Chicken or Coke — there is a

24  recipe.  Presumably, the recipe is made up of ingredients that

25  we're all familiar with, simple ingredients that you could

O7OKDUMO

1     probably buy at a supermarket — at least we hope, right — and

2     it's how they bring it together, their particular processes,

3     that makes it the trade secret.

4             So, why shouldn't that apply here as well?

5             MR. PERKINS:  Well, that's the problem, your Honor.

6     Yes, I recognize that the Kentucky Fried Chicken formula may

7     use salt and pepper and paprika, and those are publicly

8     available elements, but Kentucky Fried Chicken would have to

9     explain how their combination of those publicly available

10    elements differs from what was known at the time their trade

11    secret was created.  And under the *Big Vision* case, your Honor,

12    that's 1 F.Supp.3d 224, affirmed by the Second Circuit at

13    610 F. App'x 669, and I'll quote, "A plaintiff asserting the

14    combination trade secret must demonstrate that the way in which

15    the publicly available components fit together is unique and

16    not publicly known."

17            That's the law of the circuit, that's the law of this

18    court, and there's been no attempt in the interrogatory

19    response to explain how this all fits together in some unique

20    way, how what they're claiming is publicly available, somehow

21    the combination wasn't publicly available.  That's what's been

22    missing from their responses.

23            THE COURT:  At base, aren't we really talking about

24    the timing of this discovery?  I mean, presumably, there will

25    come a time when you will get all of this, right?

O7OKDUMO

1          MR. PERKINS:  Well, yes, your Honor --

2          THE COURT:  And why should it be now?  Or why isn't

3     what has been provided thus far sufficient at this juncture to

4     allow the parties to move forward and exchange discovery?

5          MR. PERKINS:  So, a couple of answers why:

6          One, what we have been provided with is, as I've said,

7     essentially a slightly expanded version of what was in the

8     second amended complaint; what was additionally provided were a

9     few screen displays that were barely legible and don't say

10    anything about how they're different from what's in the public

11    domain; and third was a laundry list of computer directories

12    and files.  That laundry list is meaningless because, as

13    Mr. Ackerman pointed out, there are thousands and thousands of

14    lines of code in each of the files, potentially hundreds of

15    files in each of the directories, and the plaintiff hasn't

16    said, oh, this is our old trade secret, the plaintiff has said

17    these files, quote, may be relevant, end quote.

18         So they're trying to shift the burden to the

19    defendants to look through tens of thousands or hundreds of

20    thousands or maybe millions of lines of code to find out where

21    the special sauce is.  And this is particularly complicated

22    because much of that code is open source.

23         So, if there's some special sauce here, they need to

24    explain, and point out to the defendants, where that special

25    sauce is that somehow makes this publicly available source code

1    a trade secret.

2            THE COURT:  Well, again, isn't that just a matter of

3    timing?  You have, let's say, the universe of lines of code.

4    Maybe that's all they're required to give you at this point,

5    and then further discovery — depositions, et cetera, expert

6    testimony — will delve into whether or not they actually have a

7    case for the theft of trade secrets.

8            MR. PERKINS:  The problem, your Honor — and we have

9    addressed this issue and briefed this issue when you made your

10    ruling on April 9th that led you to say that the plaintiffs

11    need to provide their theory of the case before defendants

12    produce discovery — is that in the *DeRubeis* case, which the

13    plaintiffs and defendants have cited, the Court talks about the

14    concern that the plaintiff will mold its trade secret theory

15    around whatever it gets from the defendants.

16            So, by getting an amorphous laundry list of computer

17    directories, with an amorphous textual description that doesn't

18    amplify very much from their amended complaint, the plaintiffs

19    will be in the position to say, oh, here's your program, well,

20    this is our trade secret, and that's our trade secret, and now

21    we can identify with particularity because now we see what's in

22    your actual program.

23            THE COURT:  But won't you be able, if that should come

24    to pass based on all of the information that will be provided,

25    point that out and say, aha, what you've done is you've gotten

O7OKDUMO

1    my information, and now you have molded your theory to conform

2    with what I have given you?  So, will you necessarily be

3    prejudiced if you will be able, based on the information that

4    everyone will have, to point that out?

5          MR. PERKINS:  Well, your Honor, I certainly respect

6    the wisdom of your ability to say, oh, I see what they said in

7    the amended complaint, and I see what they say in the

8    interrogatory responses, and now, after discovery, now they say

9    something totally different.  I trust your Honor will be able

10   to decipher all of that.

11         On the other hand, the burden of the time and expense

12   that the defendants need to go through, defendants' expert

13   needs to go through, to review all of the source code to try to

14   figure out where this theoretical special sauce is, is going to

15   be prejudicial to us.  And this has been a case where, as your

16   Honor has pointed out, it's been around for two years, we've

17   had motion practice, we have reviewed extensive ESI, and we're

18   still at the early stages of discovery, and my client has spent

19   a fair amount of money on this case thus far, including on

20   motions that your Honor had said were ill-advised to have been

21   made regarding potential disqualification.

22         So, my concern is, yes, your Honor, we could

23   ultimately point out to you what we believe our concern is that

24   plaintiffs may do, but, in the meantime, it will have to spend

25   thousands -- tens of thousands, maybe hundreds of thousands, of

O7OKDUMO

1    dollars pouring through their code trying to determine where

2    the secret sauce is that we can then dispel.

3           And the courts have said that's not the burden of the

4    defendants, that's not the burden of the Court, that's the

5    plaintiff's burden.  And that's why we're asking, and that's

6    why I quoted the statute, and the plaintiff recognizes it is

7    ultimately their evidentiary burden to show how their trade

8    secret differs from what is publicly known, what is generally

9    known, what's readily ascertainable.

10           And as --

11    THE COURT:  I think you mentioned that you have case

12    law that says you can't just give us the elements, you have to

13    tell us how they come together, if what you are alleging is a

14    configuration.

15    MR. PERKINS:  Exactly, your Honor.  The Second

16    Circuit, the Southern District, are clear on that, that,

17    particularly when you're claiming, as they are, it's a

18    configuration or a compilation of publicly available elements,

19    then explaining how it differs from what's publicly available

20    is critical.

21    THE COURT:  Is there an attorney eyes only clause in

22    the protective order?

23    MR. PERKINS:  There is, your Honor.

24    MR. ACKERMAN:  Yes, your Honor.

25    THE COURT:  So, Mr. Ackerman, why shouldn't that be

O7OKDUMO

1    sufficient for you at this juncture to provide that additional

2    level of detail that Mr. Perkins is talking about?

3         MR. ACKERMAN:  Well, the additional level of detail

4    that Mr. Perkins would like, where he is presumably requesting

5    us to describe the operation down to the source code level, is

6    probably hundreds of hours of expert witness work that will be

7    part of expert discovery and expert reports, but it's probably

8    at least 10,000 hours per illustrated trade secret.  We have

9    identified 12 of these trade secrets, but, at this point, we

10   are assuming that those features were made in their code that

11   we believe was appropriated in 2018.

12        THE COURT:  I'm sorry, can you repeat that for me?

13   You are assuming what?

14        MR. ACKERMAN:  In our allegation of 12 trade secrets

15   that we have identified with particularity, at this point, all

16   we can do is assume that these features are still being used by

17   defendants and are still embodied in the source code that we

18   believe was misappropriated in 2018.

19        In theory, they could have substantially modified

20   their code, and maybe six of these features that we identified

21   are completely irrelevant.  Spending a hundred thousand dollars

22   on irrelevant features because they won't provide basic

23   discovery to allow us to say, yes, our working assumption of

24   this case is correct or incorrect, because they won't provide

25   enough discovery for us to even confirm our allegations, is

O7OKDUMO

1    shifting the burden too far onto the plaintiffs.  The purpose

2    of defining the trade secret with particularity is to give

3    defendants notices of what the allegations are and define the

4    scope of discovery.  Here, we've got discovery pretty well

5    defined.  There is a specific package of software that we

6    allege was misappropriated that's subject to copyright claims

7    and trade secret claims.

8           So, discovery could go on globally because the

9    copyright is actually broader than the trade secret, but when

10   you look at the specific detail of the code, to get down to

11   that level of granularity before we even understand that our

12   assumption is correct based on our belief of the case, we are

13   now putting a significant burden on the plaintiffs --

14          THE COURT:  Will you necessarily have to get down to

15   that level of particularity?

16          MR. ACKERMAN:  That's what Mr. Perkins is asking for.

17   So, if you look at our -- the schedule that is attorneys' eyes

18   only source code — I don't want to go into too much detail on

19   the record, it's confidential — it's not just a random

20   collection of directories and files, as Mr. Perkins would

21   suggest.  Our expert has defined the feature in words, and

22   then, where appropriate, provided a screenshot illustrating how

23   that feature is operationally presented, and then describes the

24   directories of the hundreds of directories where the source

25   code is located, and then identifies key files, because this is

O7OKDUMO

1    programmed -- structured programming language, your Honor.

2    It's not like the old days where you had a thousand lines of

3    code start to finish and it runs top to bottom.  Each of these

4    directories has a file.  That file might call three other files

5    in three other directories.  So it's not going to be

6    necessarily identifying lines 8 through 15 is a trade secret.

7    It's going to be a pretty extensive explanation of the

8    operation of the code.  And that shouldn't be necessary at this

9    point, when the defendants' needs are well covered here.

10           THE COURT:  Mr. Perkins makes the point there are

11   these allegations in the complaint, I directed you to provide

12   additional detail, and the additional detail is not

13   substantially more than what's in the complaint.

14           So, what about that?

15           MR. ACKERMAN:  On that point, I significantly

16   disagree.  In the complaint, we had a half-page list of bullet

17   items, high-level description of the features.  We now have --

18           THE COURT:  And in the interrogatory responses?

19           MR. ACKERMAN:  We had a seven-page interrogatory

20   response with a 21-page schedule in which that schedule details

21   each of the 12 features with particularity, including a

22   description of the operation, which does overlap significantly

23   with the complaint because it's the same trade secret, but then

24   beneath that, we explain where the directories are that contain

25   that source code and at the specific files where that code is

O7OKDUMO

1    located.

2            We can't go molding our case randomly at this point,

3    your Honor.  If we point to something that is outside of those

4    directories and files, Mr. Perkins will have grounds to say,

5    hey, that's not the trade secret that you asserted.

6            THE COURT:  And does Mr. Perkins have those

7    directories and files that are called out by the --

8            MR. ACKERMAN:  When we exchange our source code, that

9    will all be laid out right in front of him, your Honor.

10   There's no secret to the structure of the code — it's detailed,

11   it's extensive, it's complex.  But even Mr. Perkins could look

12   at it without an expert and say, I found the directory, I found

13   the file.  He may not know what the file is because we're not

14   the programmers, but he would certainly be able to know what

15   we're talking about, and his technical expert would certainly

16   be able to know what we're talking about.

17           THE COURT:  I just want to make sure that I don't lose

18   you because what I think Mr. Perkins was referring to in this

19   chart was the difference between the allegations and your

20   interrogatory responses.

21           What I hear you describing is the difference between

22   the interrogatory responses and the actual source code.  And my

23   question is:  Shouldn't there be some greater level of detail

24   in the interrogatory responses?

25           MR. ACKERMAN:  Well, your Honor, there absolutely is

O7OKDUMO

```
 1    tremendously more detail in the interrogatory responses.  As I
 2    said, it's Schedule A, which was provided in the copy of the
 3    interrogatory responses that you have that are unredacted.  If
 4    we just look at, for example, starting on page 5 of that,
 5    where, in their chart, they say, "Integrated scheduling
 6    dispatch crew assignment tools, including" --
 7              THE COURT:  I'm sorry, you need to slow down.  You're
 8    at page 5?
 9              MR. ACKERMAN:  Page 5 of the schedule, yes.
10              THE COURT:  Well, of the interrogatory responses?
11              MR. ACKERMAN:  It's the Schedule A of the
12    interrogatory responses, your Honor.
13              THE COURT:  Schedule A.
14              Do I have Schedule A?
15              MR. PERKINS:  Yes, your Honor.  It should be attached
16    to the interrogatory responses, and separately paginated.
17              THE COURT:  Schedule A.  Okay.
18              Now, what are you reading from?
19              MR. ACKERMAN:  If we just look at B, which is the
20    second trade secret, starting on page 5 --
21              THE COURT:  Hold on.
22              Okay.
23              MR. ACKERMAN:  So, in the chart that they handed up,
24    they showed the difference in language between what's in the
25    complaint and what's in that first part of B, which is the
```

O7OKDUMO

1    verbiage describing the trade secret at a high level.  What

2    they have ignored is the fact that there is now a screenshot

3    showing this feature in its operation, and then a list of eight

4    specific directories that implement this function, and then a

5    listing of a number of files that implement that.  And it's

6    broken down further because that feature is broken down into

7    four distinct features — dispatch and crew assignment now has

8    its own set of directories and files, dispatch and view has

9    another screenshot plus directories and files, and the last

10    one, the module, has the screenshot and directories.

11            So, we do take exception with the characterization

12    that we have not provided far more detail than is in the

13    complaint and sufficient detail for them to fully understand

14    what we are alleging here.

15            MR. PERKINS:  Your Honor, if I may respond?

16            THE COURT:  Sure.

17            MR. PERKINS:  So, I hear Mr. Ackerman expressing

18    concern about his expert having to carry out their burden and

19    whose burden is it, and I've already addressed that we believe

20    it's plaintiff's burden, but I don't think what is required

21    here is necessarily giving us every single line of code in

22    which the trade secrets could be exemplified.  That would be

23    helpful, but that's not even required.  What's required, and

24    what they recognize as their burden, is to distinguish what

25    they are claiming is the trade secret from what's publicly

O7OKDUMO

1    known.

2         And your Honor can read through their 20-page

3    interrogatory response, putting aside the objections and

4    putting aside their laundry list of directories, and you will

5    find nothing — nothing — that actually explains why this

6    compilation of publicly available source code is somehow a

7    unique trade secret.  And that's what we're asking for,

8    your Honor.  We're asking for a textual explanation that says,

9    this is a special sauce trade secret because here are the

10   20 programs that were off-the-shelf available in 2018 or 2020

11   or 2023, but none of those programs could do this.  And that

12   disclosure, which is their burden to do, and the courts make

13   clear, is missing.  Rather, the text describes functionalities,

14   the end results.

15        And under applicable case law that I have cited, the

16   Second Circuit and the Southern District make clear that simply

17   listing functionalities isn't sufficient.  And I cite to the

18   *Next Communications v. Viber Media* decision by the

19   Second Circuit, 758 F. App'x 46, and the Second Circuit said,

20   "Plaintiffs' declaration fails to provide any information that

21   shows how the plaintiffs' trade secret works as a whole.  For

22   example, the plaintiff describes the functions of the various

23   components, not how they function as an operating system."

24        So, they need to go in their textual description

25   beyond simply saying, whoa, we have a software that has emails

O7OKDUMO

1    and chat functions integrated into it, which, as I'm sure,

2    your Honor, we don't need to be particularly sophisticated to

3    know that email and chat functions being integrated into a

4    software program is probably as common as the Windows feature

5    can be.

6           So, what is missing is what makes this Dumbo Moving

7    program so unique, and they admittedly use open source

8    elements, but they don't say, notwithstanding all of those open

9    source elements, we've combined it in some way that's so

10   unique, and it's different from what was publicly available and

11   publicly known and could be bought off the shelf.  That's

12   what's missing, and that shouldn't require their expert to

13   spend thousands of hours pouring through the lines of code, but

14   it should be something, your Honor, as you indicated on

15   April 9th when we were before you, that they should have known

16   two years ago when they filed their case.  They should have

17   known, before they came to federal court and signed a Rule 11

18   certification, what the trade secret was and how this software

19   differed from what was publicly available.  And I'm still

20   waiting for that disclosure.  And that's the key disclosure

21   that's required under the DTSA, and it hasn't been provided.

22          THE COURT:  Well, let me come back to the issue of

23   timing.  Let's say I direct Mr. Ackerman to give you that.  Why

24   can't I say to you, and you turn over your source code, too?

25          MR. PERKINS:  Subsequent to their disclosure of the

O7OKDUMO

1    source code?

2            THE COURT:  At the same time.

3            MR. PERKINS:  Well, we could do that, your Honor — if

4    you direct us to do that, we'll obviously comply with your

5    directive — assuming we've gotten the disclosure of how it

6    distinguishes from what was publicly available prior to the

7    production of the source code, because that's the molding

8    concern that --

9            THE COURT:  I'm sorry, so as long as plaintiffs give

10   you first how their program differs?

11           MR. PERKINS:  Correct.

12           THE COURT:  Before both sides exchange the source

13   code?

14           MR. PERKINS:  Correct.  Because what Mr. Ackerman is

15   saying is, oh, well, if the defendants' program has an email

16   chat feature, well, end of the case, we can prove they stole it

17   from us.  Well, that's not the end of the case, your Honor,

18   because I can point out 20 programs that were available at the

19   relevant time that would have email chat features.

20           And so, the key is, how is this different from what

21   was publicly available, and that's not what we have gotten from

22   the plaintiff, and that's their burden under the statute, and

23   that's undisputed.

24           THE COURT:  Mr. Ackerman?

25           MR. ACKERMAN:  Yes, back in 2016, when this software

O7OKDUMO

1    was being developed, our understanding is that there was no

2    off-the-shelf integrated software that performed these

3    functions.  Sitting here today, we are not aware of any

4    software that performs these functions as we have noted them.

5          Mr. Perkins seems to be suggesting that we need a book

6    of wisdom where we know everything that happened before, as

7    opposed to knowing that we developed this based on our

8    knowledge of the industry, and we have a good-faith belief that

9    what we have done is secret and different.

10          The cases where you see a lot of the discussion about

11    distinguishing from what is in the public domain, like I think

12    it was the big video case that Mr. Perkins was talking about,

13    the plaintiff in that case had filed a patent application where

14    he disclosed everything that was in his trade secrets

15    allegation, and he could not distinguish his trade secrets

16    allegation from his patent application.

17          That is very different than saying there is a universe

18    of unknown moving company software, and that we have to be able

19    to analyze each and every piece of software on the market to

20    say, yes, we still believe we have a trade secret.

21          THE COURT:  Now, I'm seeing those pink trucks all over

22    the place now.

23          MR. ACKERMAN:  We'll be very happy to report that to

24    our client.

25          THE COURT:  Very well.

O7OKDUMO

1          Look, this is not going to get resolved today.  So,

2     Mr. Perkins, you can make your motion, but, as I sit here,

3     we've got to move off of this dime.  And, again, I don't know

4     that the level of detail that Mr. Ackerman has provided so far

5     in terms of a description textually as to what their trade

6     secrets are is sufficient, but I can't imagine that they would

7     be required at this juncture to provide the level of detail,

8     Mr. Perkins, that you are suggesting, because that's what comes

9     through normal discovery, expert discovery, et cetera.

10          So, you can make your motion.  I would advise the

11     parties to continue to speak, and to continue to speak about

12     how we can get this done easier.  Again, I keep coming back to

13     timing because if this goes forward, everyone is going to know

14     everything, and so, why are we spending all this time fighting

15     about these sorts of issues.

16          But how much time do you want, Mr. Perkins?  Two

17     weeks?  Three weeks?

18          MR. PERKINS:  Three weeks should be fine, your Honor.

19          THE COURT:  Okay.

20          Three weeks to respond, one week to reply.

21          MR. PERKINS:  And, your Honor, I hear you loud and

22     clear.  And, again, I'm trying to minimize the burden on

23     plaintiffs while maximizing the benefit to defendants.

24          THE COURT:  Sure.

25          MR. PERKINS:  And that's why I would suggest, rather

O7OKDUMO

```
1     than what Mr. Ackerman is concerned about with the expert

2     delineating lines of code, is to provide us with a greater

3     textual description that addresses the burden under the

4     statute.  And I will make that the focus of our motion.

5               THE COURT:  Because, certainly, the point that you

6     made, Mr. Perkins, is that, look, you know, you've brought this

7     case, Mr. Ackerman, you say that your trade secrets were

8     stolen, tell them what the trade secrets are.  It shouldn't be

9     that difficult.  Well, I don't know.

10              MR. ACKERMAN:  Okay.

11              THE COURT:  Okay.

12              So, Ms. Trotman, do we have actual dates of

13    three weeks, three weeks, one week?

14              THE DEPUTY CLERK:  Yes.

15              The motion is due August 14; the response is due

16    September 4; and a reply is due September 11.

17              MR. PERKINS:  And, your Honor, thank you.

18              How would you like us to address the broader

19    scheduling issues in the meantime while we --

20              THE COURT:  You should speak, obviously, with

21    Mr. Ackerman and Mr. Chiu, and I will grant whatever reasonable

22    request for an extension you guys ask for.

23              Anything else you wanted to put on the record,

24    Mr. Chiu?

25              MR. CHIU:  No, your Honor.  Thank you very much.
```

O7OKDUMO

```
 1              THE COURT:  Okay.

 2              Thank you, everyone.

 3              MR. PERKINS:  Thank you, your Honor.

 4              MR. ACKERMAN:  Thank you, your Honor.

 5              MR. TURMAN:  Thank you, your Honor.

 6              (Adjourned)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```