UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DUMBO MOVING & STORAGE, INC.,

                Plaintiff,

– *against* –

PIECE OF CAKE MOVING & STORAGE LLC, SIMPLY MOVING LLC, SIMPLY MOVING STORAGE LLC, STEFAN MARCALI, VOJIN POPOVIC, *and* VOLODYMYR PLOKHYKH,

                Defendants.

**OPINION & ORDER**

22 Civ. 5138 (ER)

RAMOS, D.J.:

    Dumbo Moving & Storage, Inc. ("Dumbo") brought this action against three other moving companies, Piece of Cake Moving & Storage LLC ("POC"), Simply Moving LLC ("Simply Moving"), and Simply Moving Storage LLC ("Simply Storage"), their owners, and a former employee[1] (collectively, "Defendants"). In short, Dumbo alleges that Defendants improperly reproduced and misappropriated its trade secrets. Doc. 11 ¶¶ 1–60.

    Pending before the Court is Defendants' motion to compel Dumbo to identify its trade secrets, or in the alternative, for partial Summary Judgment, Doc. 133. For the reasons set forth below, the motion is DENIED.

**I.    BACKGROUND**

    The Court assumes familiarity with the factual allegations and procedural history, which have been discussed in previous opinions. *See Dumbo Moving & Storage, Inc. v.*

---

[1] The individual defendants are Stefan Marcali, Vojin Popovic, and Volodymyr Plokhykh. Marcali is the owner of Simply Moving and Simply Storage. Doc. 11 ¶ 7. Popovic is the owner of POC. *Id.* ¶ 6. Plokhykh is a former employee of Dumbo. *Id.* ¶ 17.

*Piece of Cake Moving & Storage LLC*, No. 22 Civ. 5138 (ER), 2023 WL 5352477, at *1–4 (S.D.N.Y. Aug. 21, 2023) ("*Dumbo I*"); *Dumbo Moving & Storage, Inc. v. Piece of Cake Moving & Storage LLC*, No. 22 Civ. 5138 (ER), 2024 WL 3085052, at *1–2 (S.D.N.Y. June 20, 2024) ("*Dumbo II*"). The relevant details are reproduced here for convenience, and they are supplemented by additional evidence produced through discovery.

### A. Factual Overview

Dumbo is a Brooklyn-based moving company that started its business in 2006. *Dumbo I*, at *1. Since 2006, Dumbo grew from a small business with one truck to a large moving company with over fifty-five trucks. *Id.* Today, it is one of the largest moving companies in the tri-state area, and it also provides long-distance moving services throughout the United States. *Id.*

In 2016, Dumbo began developing a digital management system to coordinate customer orders and fulfillment. *Id.* at *2. The system was designed to assign trucks and crews, track job performance with real time updates, and provide customers with instant price quotes based on a "proprietary algorithm." *Id.* Because Dumbo could not find existing software that it could use for these purposes, Lior Rachmany, the owner of Dumbo, pitched his idea for the system to Volodymyr Plokhykh, one of his then-employees. *Id.* After hearing the idea, Plokhykh introduced Rachmany to IT Dev Group, Inc., a software development company that develops "custom software in collaboration with companies in various industries." *Id.*

Dumbo ultimately retained IT Dev Group, to "collaborate on the development of an exclusive and proprietary software system referred to as the 'Moving Company Automated Central Management System' . . . , for Dumbo's proprietary and exclusive benefit."[2] *Id.* Dumbo has alleged this software includes numerous features that were not

---

[2] In order to "secure and protect" the software and its source code, the complaint alleges that the following measures were taken: (1) IT Dev Group and Dumbo agreed that Dumbo would have exclusive ownership

previously incorporated in any software designed specifically for the moving industry. *Id.* For example, Dumbo asserted in its First Amended Complaint ("FAC") that the software "incorporates functions to enable Dumbo to develop and track business leads, book customer moves, schedule moves[,] assign trucks and crews [ . . . ,] and track moves in real time." *Id.* It also allows Dumbo to "provide paperless invoices and bills of lading to customers," track business analytics, and provide customer support through instant online communications. *Id.* Importantly, it also allows Dumbo to generate a "Guaranteed Price" for Dumbo to charge customers for any given job. *Id.* ¶ 24. "The ability to generate a 'Guaranteed Price' was intended to give Dumbo a competitive advantage in the marketplace as a customer's decision to select Dumbo over a competitor was in large part driven by the certainty of the price quote. After the Exclusive Software launched in late 2018, the 'Guaranteed Price' became a key feature in Dumbo's marketing to customers." *Id.* ¶ 25. The FAC adds that the software was created using knowledge about the marketplace that Dumbo acquired through years of experience in the moving business. Doc. 11 ¶ 23. Dumbo invested more than $100,000 to develop the software over a two-year period. *Id.*

The software "made Dumbo's operation far more efficient and profitable than it had been before its implementation," which took place in June 2018. *Id.* at *3. In fact, Dumbo generated more than $36,000,000 in revenue in 2020, more than double the $17,500,000 in revenue that it generated in 2017, before it began using the software. *Id.*

---

of all rights and interests in the software; (2) Dumbo did not provide any person or entity with a license or permission to disseminate the software at any time; (3) Dumbo did not share the software with any third parties; (4) Dumbo did not give its employees or independent contractors access to the software or its source code; (5) the software and source code were stored on a "separate secured server maintained for Dumbo's benefit" by IT Dev Group, "which had an obligation and fiduciary duty to secure and safeguard" the software; (6) IT Dev Group was solely responsible for maintaining and updating the software. *Dumbo I* at 2 n.4 (citing Doc. 11 ¶ 46). The complaint further alleges that POC, Simply Moving, Marcali, and Popovic "were [] aware the [e]xclusive [s]oftware was solely and exclusively owned by Dumbo." *Id.* (citing Doc. 11 ¶¶ 104, 115).

3

Dumbo alleges that several competitors, none of whom had similar digital management systems, noticed the success that Dumbo experienced using its new software. *Id.*

According to Dumbo, Plokhykh made an unauthorized copy of its software around the time that Dumbo implemented it in June 2018. *Id.* While still employed by Dumbo, Plokhykh allegedly launched a "demonstrator site" to market and sell the software to Dumbo's regional competitors as well as other moving companies nationwide. *Id.* The site "purports to be a website for an entity referred to as QQ Moving Companies or Quick Quote Moving," and is available at https://qqmoving.com. Doc. 11 ¶¶ 54–55. Plokhykh is the Chief Executive Officer of QQ Moving. *Id.* ¶ 55. Plokhykh allegedly actively marketed and sold the software while continuing to work as a store manager for Dumbo. *Dumbo I*, at *3.

Thereafter, POC and Simply Moving allegedly incorporated the software into their website. *Id.* According to Dumbo, the only difference in the software was "a change in the 'Guaranteed Price' algorithm to ensure that any quote generated by POC and Simply [Moving] would be lower than the quoted price offered by Dumbo." *Id.* The defendants allegedly used their unauthorized access to Dumbo's software to gain an immediate competitive advantage over Dumbo. *Id.*

In August 2020, Dumbo Guaranteed Price' Plokhykh's employment and IT Dev Group terminated its relationship with him. *Id.* As of August 2022, Plokhykh allegedly continued to market and sell the software to competitors, and POC, Simply Moving, Marcali, and Popovic allegedly continued to benefit from the use of the software. *Id.*

### B. Procedural History

#### 1. *Pre-Discovery*

Dumbo filed the initial complaint on June 17, 2022, Doc. 1, and amended it for the first time on September 6, 2022, Doc. 11. On January 13, 2023, three separate motions to dismiss were filed by POC, Popovic, Simply Moving and Simply Storage,

4

Plokhykh, and by Marcali, Docs. 40, 43, 46.  Dumbo moved for leave to file a second amended complaint ("SAC") on February 24, 2023, Doc. 53.

On August 21, 2023, the Court granted in part and denied in part the motions to dismiss the FAC.  *Dumbo I*.  In particular, it dismissed Dumbo's state law claims, as well as claims previously withdrawn by Dumbo, but allowed certain copyright infringement claims and trade secrets claims to proceed.  *Id.*  In the same opinion, the Court granted in part and denied in part Dumbo's motion for leave to file a SAC, allowing it to replead certain copyright infringement and misappropriation of trade secrets claims.  *Id.* at *10. Dumbo filed its SAC on September 5, 2023.  Doc. 66.  On October 25, 2023, a discovery plan was entered, Doc. 80, and on March 19, 2024, the Court granted several deadline extensions, including an extension to November 27, 2024 for the completion of all discovery.  Doc. 114.

2. *Discovery and Trade Secret Identification*

On March 19, 2024, Defendants requested a pre-motion conference to discuss the "timing and need" for Dumbo to identify its trade secrets.  Doc. 115 at 3.  They argued that Dumbo should be required to identify its trade secrets with reasonable particularity "before Defendants are obligated to produce their proprietary source code and software." *Id.* at 1.  Dumbo's position, by contrast, was that it had sufficiently identified its trade secrets at this stage of discovery, and that the parties should exchange their source codes simultaneously.  *Id.*; *see also* Doc. 115-2 at 1.  At a pre-motion conference held on April 10, 2024, the Court stated that "defendants are entitled to an explanation of plaintiff's theory of the case before the plaintiff gets the benefit of defendant's discovery," and it instructed Defendants to put in a formal discovery request to Dumbo for that information. Doc. 121-1 at 11:7–9, 12:16–17.

Defendants served interrogatories on April 11 specifically requesting that information.  *See* Doc. 135-2.  Of relevance to the instant motion, the interrogatories requested the following:

5

> Interrogatory 1.  Identify each and every Trade Secret in the Dumbo Software with sufficient specificity and particularity so as to distinguish those Trade Secrets from information, software or other material that is in the public domain or otherwise generally known.
>
> Interrogatory 3.  For each and every Trade Secret identified in Interrogatory 1, describe the independent economic value that Dumbo derives from those Trade Secrets by virtue of them not being generally known to, and not being readily ascertainable through proper means by, another Person who can obtain economic value from the disclosure or use of the Trade Secrets.

*Id.* at 5–6.  Dumbo provided its initial responses on June 4.[3]  Doc. 135 ¶ 5; *see* Doc. 135-3.  In response to Interrogatory 1, Dumbo attached a Schedule A, titled "Dumbo Moving Preliminary Trade Secrets Identification (with Exemplary Citations to Computer Code)," which listed twelve alleged trade secrets.  Docs. 135-3 at 9, 134 at 1.  In the Schedule A, Dumbo included "narrative descriptions" for each of the twelve alleged trade secrets, each followed by a list of "specific references to the directories and files within the software where the trade secrets are implemented"; for some, Dumbo additionally included "illustrative screenshots of key features."  Doc. 143 at 2.  Dumbo reserved the right to supplement and/or amend its identification of trade secrets.  *See* Doc. 146 at 6.  In response to Interrogatory 3, Dumbo responded that the trade secrets identified in Schedule A provide it with "significant competitive advantages and economic benefits, including, but not limited to":

> a. **Operational Efficiency**:  The trade secrets enable more efficient and streamlined operations, reducing costs, and increasing productivity.
>
> b. **Customer Satisfaction**:  The unique functionalities and features of the Dumbo Software improve customer experience, leading to higher customer retention and satisfaction rates.
>
> c. **Market Positioning**:  The proprietary nature of the software allows Dumbo to differentiate itself from competitors, thereby securing a stronger market position.

---

[3] Defendants state, "[w]ithout seeking or obtaining an extension, Dumbo, however, did not provide its responses until more than three weeks after the applicable 30-day deadline."  Doc. 134 at 3.  Defendants argue that, due to this untimeliness, Dumbo cannot rely on its objections made in these original responses to Defendants' interrogatories.  *Id.* at 15 n.5.

> d. **Revenue Generation**: The enhanced capabilities of the Dumbo Software contribute to increased revenue through improved service offerings and operational effectiveness.

Doc. 135-3 at 5. Dumbo noted it "reserves the right to supplement this response as discovery progresses and more detailed financial and economic analyses are conducted, including expert testimony where appropriate." *Id.*

Defendants deemed that these interrogatory responses were "materially deficient, providing little useful detail beyond the information contained in Dumbo's complaint."[4] Doc. 134 at 3. Following a meet-and-confer, Defendants filed a letter on July 3, 2024, requesting another pre-motion conference. Doc. 121. Defendants argued that Dumbo again failed to identify its alleged trade secrets with the requisite "reasonable particularity," this time through deficient interrogatory responses. Doc. 126 at 1. The Court held a conference on July 24, at which it granted leave for Defendants to file the instant motion to compel. *See* Min. Entry dated July 24, 2024.

---

[4] The SAC provides the following twelve-item list of "unique and novel features implemented in a manner not generally known in the industry previously that gave Dumbo an edge over its competition":

> "a. Communication tools that enable Dumbo to communicate with both customers and employees using Dumbo's website, obviating the need for paper printouts that were previously provided to employees and customers;
>
> b. Integrated scheduling, dispatch, and crew assignment tools, including advanced graphical user interface with status boards;
>
> c. Lead aggregation tools which group leads by specified parameters and filters;
>
> d. Digital bills of lading available for all shipments and deliveries, eliminating reliance on paper originals and copies;
>
> e. Customer Relationship Management (CRM) features that provide Dumbo the ability to follow up with customers, keep them up to date on special offers and increase lead generation by creating an automated list of customers and potential customers based on user interaction with the website;
>
> f. Seamless integration of data related to storage and moving services
>
> g. Data aggregation features, including the ability of Dumbo and its customers to track the status of any move in real time using an easy-to-follow map and graphical interface;
>
> h. An easy and seamless online payment system that enables customers to make payments online, with Dumbo employees receiving real time notice of the clearance of customer payments;
>
> i. Integrated and automated compensation calculation and payment processing for contractors and commissioned employees[.]" Doc. 66 ¶ 32.

Dumbo served amended interrogatory responses on August 5, 2024. Docs. 134 at 4, 135-4. In response to Interrogatory 1, Dumbo included the following new statement:

> When Dumbo began the development of its Dumbo Software, it was not aware of commercially available software for the moving industry, and is still unaware of software for the moving industry that performs the features and functions of Dumbo's trade secrets detailed in Schedule A. Although an internet search shows that third-party software companies now offer software for the moving industry, Dumbo is not aware of the features and operation of any such software. Therefore, upon information and belief, Dumbo derives independent economic value from its trade secrets not being generally known and Dumbo's trade secrets detailed in Schedule A are distinguishable from "material that is in the public domain or otherwise generally known."

Doc. 135-4 at 4.[5] In its amended Schedule A, Dumbo did not include additional details in its narrative descriptions of the twelve alleged trade secrets, however it included new illustrative screenshots. *See* Doc. 134 at 4. In response to Interrogatory 3, Dumbo included the following new statement:

> Dumbo made considerable investments in time and money to develop the Dumbo Software which embodies each of the trade secrets identified in Schedule A. This investment in the development of proprietary software, that was not intended to be made available to its competitors, allowed Dumbo to gain a competitive advantage over its competitors, realize significant savings, realize increased revenue, and grow its business.

Doc. 135-4 at 5.

On August 23, 2024, Defendants filed the instant motion to compel Dumbo to supplement its interrogatory responses to make a proper trade secret identification, and in the alternative, for partial summary judgment, Doc. 133. Defendants additionally submitted expert declarations, Docs. 135, 136, and a Rule 56.1 statement, Doc. 137. Dumbo opposed the motion, Doc. 143, and filed its own expert declaration, Doc. 145. Defendants POC, Vojin Popovic, Simply Moving LLC, Simply Moving & Storage LLC, and Stefan Marcali (the "POC Defendants"), and defendant Plokhykh, filed separate

---

[5] In Dumbo's responses to the interrogatories, "Interrogatory 1" is labeled as "Interrogatory 11," and "Interrogatory 3" is labeled as "Interrogatory 13." Doc. 134 at 1; *see, e.g.*, Doc. 135-3 at 3–4.

replies, Docs. 146, 149, respectively, along with an additional expert declaration, Doc. 147.

At a court conference on December 12, 2024, the parties noted they had not completed all discovery by the November 27, 2024 deadline. Although they had exchanged interrogatories and responses thereto, they had not produced any documents. Dumbo argues that "discovery has not meaningfully progressed due to Defendants' refusal to produce any documents or materials until this issue [regarding identification of the trade secrets] is resolved." Doc. 143 at 4.[6] Dumbo "has been ready, willing, and able to exchange source code with Defendants, as agreed upon months ago," however it refuses to heed "Defendants' demand for unilateral production" of Dumbo's source code, "without reciprocal discovery." Doc. 143 at 3.

## II. DISCUSSION

Defendants move to compel Dumbo, pursuant to Rule 37, "to provide reasonably particularized identification of its alleged trade secrets in responses to Interrogatory Nos. 1 and 3." Doc. 134 at 1. In the alternative, they request that the Court grant partial summary judgment against Dumbo, pursuant to Rule 56, dismissing Dumbo's trade secret claims. *Id.*

### A. TRADE SECRET IDENTIFICATION

#### 1. *Legal Standard*

Under Federal Rule of Civil Procedure 37, "a party seeking discovery may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B). Such motion to compel can be made if, for example, "a party fails to answer an interrogatory." Fed. R. Civ. P. 37(a)(3)(B)(iii). Rule 37 treats an "evasive or

---

[6] Defendants provided in a March 19, 2024 letter to the Court: "To be clear, Defendants are willing to produce all other relevant and responsive materials [other than their proprietary source code and software] in the ordinary course of discovery following agreement on ESI search terms." Doc. 115 at 1.

9

incomplete" answer to discovery requests as a "failure" to answer.  Fed. R. Civ. P. 37(a)(4).

Effective on May 11, 2016, the Defend Trade Secrets Act, or DTSA, created a private right of action for the misappropriation of trade secrets in federal court. 18 U.S.C. § 1836(b); *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27 (2d Cir. 2019) (summary order); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 463 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).  Trade secrets under the DTSA can include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes[.]"  18 U.S.C. § 1839(3).  For any of these types of information to qualify as a trade secret under the DTSA, their owner must have "taken reasonable measures to keep such information secret," and the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(A)–(B).

To show that something constitutes a trade secret, courts within this Circuit have required that the trade secret first be identified with "reasonable particularity."  *Bytemark, Inc. v. Xerox Corp.*, No. 17 Civ. 1803 (PGG), 2022 WL 120980, at *4 (S.D.N.Y. Jan. 11, 2022); *see also Next Communications, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018) (summary order) ("[I]n the context of a trade secret misappropriation claim, the party opposing summary judgment must be able to identify the alleged trade secret with sufficient specificity to make the moving party aware of what information it has allegedly misappropriated."); *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590 (2d Cir. 1963) (finding a casual, single-word description of a trade secret was too "vague and indefinite" to be a legally protectable disclosure of a trade secret).  This "reasonable particularity" standard exists "in recognition of the proprietary concerns in trade secrets

cases and the related difficulty in defining the scope of discovery." *Bytemark, Inc.*, 2022 WL 120980, at *4.

The standard "generally requires that the plaintiff provide enough information about the alleged trade secrets (1) to put the defendant on notice of the nature of plaintiff's claims, and (2) to allow defendant to discern the relevancy of any discovery requests." *Bytemark, Inc.*, 2022 WL 120980, at *4 (quoting *Uni-Systems, LLC v. U.S. Tennis Association*, No. 17 Civ. 147 (KAM) (CLP), 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017). "The standard is flexible and is driven by the Court's discretion. Courts have recognized that a very general showing may be sufficient, particularly in the common scenario where the trade secrets plaintiff may not know which parts of its trade secrets have been misappropriated or cannot determine the full scope of its claims until it gains a better understanding of how a defendant operates." *Id.* Therefore, "the strength of the showing sufficient to identify trade secrets with sufficient particularity varies with the facts and stage of the case." *Id.*

"Federal cases analyzing whether a plaintiff's trade secrets are described with 'sufficient particularity' typically arise in the battleground of discovery. In such cases, discovery provides an iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 662 (9th Cir. 2020). The process of refining the identification of trade secrets through discovery "acknowledges the inherent tension between a party's desire to protect legitimate intellectual property claims and the need for intellectual property law to prevent unnecessary obstacles to useful competition." *Id.*

Dumbo and Defendants agree that the "reasonable particularity" standard helps serve four policy purposes established in *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 680–81 (N.D. Ga. 2007): (1) preventing fishing expeditions whereby a lawsuit is filed as a tactic to obtain defendants' trade secrets through discovery, (2) ensuring the relevance and permissible bounds of discovery sought, (3) informing

11

defendants of the trade secrets allegedly misappropriated so they can mount a defense, and (4) ensuring that a plaintiff not "mold its cause of action around the discovery it receives." *Id.* at 681.

 2. *Discussion*

The Court determines that at this "stage of the case," Dumbo has identified its trade secrets with sufficient particularity. *Bytemark, Inc.*, 2022 WL 120980, at *4 (quoting *Uni-Systems*, 2017 WL 4081904, at *4).

Although discovery began over a year ago, no documents have been produced as of the date of the instant motion, and the parties have not exchanged their source code. Dumbo's narrative descriptions of twelve alleged trade secrets, combined with illustrative screenshots and specific source code references, put Defendants sufficiently "on notice" of the nature of Dumbo's claims. *Id.*[7]

First, Defendants argue that Dumbo's narrative descriptions describe only the *functionalities* of Dumbo's alleged trade secrets, not the specific mechanics of how the code uniquely *produces* those functionalities. Doc. 134 at 14–15. Yet the cases which Defendants rely on do not stand for the proposition that such descriptions are inherently insufficient, particularly where, as here, they are accompanied by specific references to the source code—which Dumbo has offered to produce in a simultaneous exchange of source code with Defendants. For example, in *Next Communications, Inc. v. Viber Media, Inc.*, the district court found that trade secrets had not been described with sufficient particularity, in part due to "vague descriptions," following a substantial production of documents.[8] No. 14 Civ. 8190 (RJS), 2017 WL 4402540, *5 (S.D.N.Y.

---

[7] Defendants do not claim that they would be unable to "discern the relevancy of future discovery requests." *Id.*

[8] The parties had completed "Phase I" of discovery, which, pursuant to a court order, included plaintiff's production of email correspondence, PowerPoint slide decks, and declarations from its CEO and technical advisor. *Next Communications, Inc. v. Viber Media, Inc.*, No. 14 Civ. 8190 (RJS), 2017 WL 4402540, *1, *2 (S.D.N.Y. Sept. 30, 2017), *aff'd*, 758 F. App'x 46 (2d Cir. 2018). After the Phase I production, the defendant deposed the plaintiff's Rule 30(b)(6) witness regarding those documents; it was only thereafter

Sept. 30, 2017), *aff'd*, 758 F. App'x 46 (2d Cir. 2018).  The *Next Communications* court had ordered the plaintiff to produce, in "Phase I" of discovery, "all materials and information [that] . . . contain[ed] and/or constitute[d] trade secrets or confidential information . . . including, without limitation, the alleged Proprietary Information." *Id.* at *2.  It also instructed the plaintiff to identify "*with particularity* in writing" which parts, if any, of that production "constitute[d] Proprietary Information or trade secrets." *Id.* (emphasis in original).  Ultimately, at summary judgment, the *Next Communications* court determined that these "discovery materials offer[ed] little clarification" of what constituted the trade secrets, in part due to plaintiff's "vague descriptions" and plaintiff's failure to identify what made its design "unique, valuable, and secret." *Id.* at *5.

Here, by contrast, Dumbo is yet to produce its proprietary software—the material which it alleges "embodies a unique expression of source code," and where its twelve alleged trade secrets are "embedded."  Doc. 143 at 2.  According to Dumbo's expert, once Dumbo's source code is produced, Defendants "will be able to evaluate the files and directories identified by Dumbo and fully understand the scope of Dumbo's trade secrets as identified in Dumbo's Schedule A."  Doc. 145 ¶ 9.  Moreover, Dumbo claims that a mutual exchange of source code "will quickly confirm or refute Dumbo's allegations."  Doc. 143 at 5.  Therefore, further identification of Dumbo's trade secrets via interrogatory responses is unnecessary at this time.

Second, Dumbo is not required to demonstrate the uniqueness of its trade secrets this early in discovery.  Defendants' expert enumerates publicly available sources which appear to offer similar types of services and functionalities as those which Dumbo describes for its twelve alleged trade secrets.  *See, e.g.*, Doc. 136 ¶¶ 22, 41.  In turn, Defendants claim, "Dumbo must distinguish its trade secrets from the public domain information cited by [the expert] as well as any other generally available sources."  Doc.

---

that the defendant made the motion for summary judgment which was ultimately granted.  *See id.* at *2–3, *9.

134 at 16. However, Dumbo's "fail[ure] to distinguish any of the 12 Dumbo's Alleged Trade Secrets from generally known matters" at this stage does not render its identification of trade secrets insufficiently particular. Doc. 136 ¶ 25.[9] *Cf. Sit-Up Ltd. v. IAC/InterActiveCorp*, No. 5 Civ. 9292 (DLC), 2008 WL 463884, at *5, *10 (S.D.N.Y. Feb. 20, 2008) (finding Plaintiff failed to show its trade secret's uniqueness at the summary judgment stage, "following massive document discovery"). While Dumbo ultimately bears the burden to prove that its trade secrets are distinguishable from generally known matters, and that Dumbo derives specific economic value from them, Dumbo need not do so before proceeding to document discovery. *See, e.g.*, *Bytemark, Inc.*, 2022 WL 120980, at *3 n.1 (denying motion to compel plaintiff to respond to interrogatory which requested, in part, that plaintiffs identify, "the means by which the alleged trade secret derives independent economic value from not being generally known"); *see Uni-Systems*, 2017 WL 4081904, at *4 (internal quotations and citations omitted) (denying motion to compel plaintiff to identify its trade secrets through more specific interrogatory responses, and noting "the requirement of reasonable particularity does not create a procedural device to litigate the ultimate merits of the case – that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists.").

Moreover, neither the public sources identified by Defendants' expert, nor the existence of "references to open source code" in Dumbo's software,[10] Doc. 146 at 5, are fatal to Dumbo's trade secrets identification, as "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but

---

[9] Defendants make a vague argument that Dumbo has "Rule 11 obligations" to differentiate—or conduct a "reasonable investigation" aimed at differentiating—its alleged trade secrets from generally known matters. Doc. 134 at 16, 21. However, Defendants do not explain or substantiate how Rule 11 imposes any such obligations on Dumbo.

[10] Defendants argue that "Dumbo also fails to address the fact that separating the alleged trade secrets from publicly available information is critical since Dumbo admits that its source code contains 'references to open source code bases,' which clearly cannot be a trade secret." Doc. 146 at 5.

14

the unified process, design[,] and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *See Next Communications, Inc.*, 758 F. App'x at 48 (quoting *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)).

Third, Defendants argue that if the parties were to simultaneously exchange their source code, Dumbo could "mold its trade secret identification to discovery from Defendants," "simply by claiming that any aspect of Defendants' software even remotely similar to Dumbo's software is somehow based on a Dumbo trade secret." Doc. 134 at 8. Defendants allege Dumbo's "list of alleged trade secrets is still on its face subject to change," given Dumbo refers to its source code citations as "exemplary," and it "reserv[es] the right to supplement and/or amend [its] *preliminary* identification of trade secrets." Doc. 146 at 6 (emphasis in original). Dumbo responds that "there is little risk that [it] will improperly expand the scope of its trade secret claims based on the discovery it receives," as its "specific identification of a small number of files and directories where an embodiment of the trade secret is located . . . places real and material limits on Dumbo's ability to expand its trade secrets definitions based on Defendants' discovery." Docs. 143 at 5, 145 ¶ 10.

The Court determines that Dumbo's present trade secrets identification is not inherently susceptible to the risks that it will expand discovery beyond "permissible bounds," or otherwise "mold its cause of action" to Defendants' documents. *DeRubeis*, 244 F.R.D. at 680–81. *Cf. Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1167 (emphasis added) (9th Cir. 1998) (emphasis added) (finding "the catchall phrase 'including every dimension and tolerance that defines or reflects that design'" was not sufficiently specific because, under the facts of the case, "reasonable specificity could only be achieved by identifying the *precise* numerical dimensions and tolerances as trade secrets."). Dumbo's narrative descriptions and source code references, corresponding to each of twelve alleged trade secrets, will anchor any future discovery. Should a basis

ultimately arise for Defendants to argue that Dumbo has attempted to improperly expand its trade secrets identification, Defendants may make an application at that time.

Finally, Defendants claim that, "by listing hundreds of exemplary directories and files . . . each of which may contain thousands of lines of code," Dumbo attempts to shift its burden to Defendants to identify its trade secrets and distinguish them from publicly known matters, which in turn prejudices Defendants in their ability to conduct fact and expert discovery. Doc. 146 at 5–6, 7. However, Dumbo's source code references are hardly a "laundry list" of directories and files, as Defendants call them. Doc. 146 at 1. Dumbo's lists of directories and files—which Dumbo refers to as a "small number of files"—are broken down by "directory names, folder names, and file names." Docs. 145 ¶ 10, 135-4 at 5. Dumbo explains that these source code references, listed separately for each of the twelve alleged trade secrets, are where the "*embodiment* of the trade secret is located." Doc. 145 at 4 (emphasis added). Again, these references, along with the narrative descriptions and illustrations, sufficiently put Defendants "on notice" of Dumbo's claims. *Bytemark, Inc.*, 2022 WL 120980, at *4.

Defendants explicitly state that they "are not seeking at this time a line-by-line identification of Dumbo's alleged trade secrets within its source code." Doc. 134 at 12. Once the source code is produced, Defendants and their experts "will be able to evaluate the files and directories identified by Dumbo." Doc. 145 ¶ 9. If Defendants are nonetheless unable to "fully understand the scope of Dumbo's trade secrets as identified in Dumbo's Schedule A," *id.*, Defendants can seek further refinement of Dumbo's trade secrets identification, such as by asking Dumbo to narrow its source code references. *See InteliClear*, LLC, 978 F.3d at 662 ("[D]iscovery provides an iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification."); *see, e.g.*, *RealD Spark LLC v. Microsoft Corp.*, No. 22 Civ. 942 (TL), 2023 WL 3304250, at *5–*6 (W.D. Wash. May 8, 2023) (directing plaintiff to specify which pages within a 3,000-page production contained its allegedly secret algorithms, or

16

to otherwise produce the algorithms to defendant). *Cf. Big Vision Private, Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd*, 610 F. App'x 69 (2d Cir. 2015) (holding trade secrets were insufficiently identified, at *summary judgment*, upon determining that the documents produced were "hardly illuminating" and the plaintiff was "unwilling or unable to winnow its trade secret from dozens of pages of materials").

In sum, the Court declines to compel Dumbo to provide "a detailed textual description (beyond functionality) of the precise contours of the alleged 12 trade secrets, how they work, and how they differ (if at all) from generally known matters" at this juncture. Doc. 134 at 12. The Court denies Defendants' motion to compel, without prejudice, and it directs the parties to exchange their source code.

### B. SUMMARY JUDGMENT

Defendants move for partial summary judgment as an alternative to their motion to compel, arguing that "[i]f Dumbo continues to refuse or otherwise fails to define its alleged trade secrets with reasonable particularity as requested, its trade secret claims should be dismissed with prejudice." Doc. 134 at 22. Defendants did not request a pre-motion conference nor file a letter "setting forth the basis for the anticipated motion" for summary judgment, as this Court requires. *See* Individual Practices of Judge Edgardo Ramos at 2(a)(ii). In any event, in light of the Court's finding on the motion to compel that Dumbo has provided a sufficiently particular identification of its trade secrets at this stage in discovery, the Court denies Defendants' motion for partial summary judgment.

## III.   CONCLUSION

For the foregoing reasons, the Defendants' motion to compel Dumbo's trade secret identification, or in the alternative, for partial summary judgment, is DENIED without prejudice.

The parties are directed to appear for a status conference at 10:30 a.m. on January 29, 2025.

17

The Clerk of Court is respectfully directed to terminate the motion, Doc. 133.

It is SO ORDERED.

Dated:  January 16, 2025
        New York, New York

_____
Edgardo Ramos, U.S.D.J.