# Exhibit B

P7MCpieC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DUMBO MOVING & STORAGE, INC.,

                    Plaintiff,

          v.                              22 Civ. 5138 (ER)

PIECE OF CAKE MOVING & STORAGE
LLC,

                    Defendant.            Teleconference
------------------------------x
                                          New York, N.Y.
                                          July 22, 2025
                                          10:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                          District Judge

                         APPEARANCES

THE LAW OFFICE OF AVRAM E. FRISCH LLC
     Attorney for Plaintiff
BY:  AVRAM E. FRISCH

MORRISON COHEN LLP
     Attorneys for All Defendants except Plokhykh
BY:  FRED H. PERKINS
     TESS BONOLI

MESTECHKIN LAW GROUP PC
     Attorneys for Defendant Plokhykh
BY:  TSETSENCHIMEG BAIGALMAA

P7MCpieC

1                    (The Court and all parties appearing telephonically)

2                    THE COURT:  Good morning, everyone.  This is

3    Judge Ramos.

4                    Jazmin, please call the case.

5                    (Case called)

6                    MR. FRISCH:  Good morning, your Honor.  Avram Frisch,

7    The Law Office of Avram A. Frisch, on behalf of plaintiff,

8    Dumbo Moving & Storage.

9                    THE DEPUTY CLERK:  Counsel for Piece of Cake Moving

10   defendant.

11                   MR. PERKINS:  Good morning, your Honor.  This is Fred

12   Perkins from Morris & Cohen on behalf of the Piece of Cake

13   defendants.  With me today is my associate Tess Bonoli.

14                   THE DEPUTY CLERK:  Counsel for defendant Plokhykh.

15                   MS. BAIGALMAA:  Good morning, your Honor.  My name is

16   Tsetsenchimeg Baigalmaa with Mestechkin Law Group.  We

17   represent defendant Volodymyr Plokhykh.

18                   THE COURT:  Good morning to you all.  This matter is

19   on for a conference.  I note for the record that it is being

20   conducted by telephone.

21                   I believe this is the first time that Mr. Frisch has

22   appeared on this case before me and that there are some

23   residual discovery issues.

24                   So, Mr. Perkins, why don't I begin with you.  What

25   appears to be going on?

P7MCpieC

1          MR. FRISCH:  Thank you, your Honor.  I think there are

2     three issues, but let me deal with them in order.

3          First is the production of documents by Dumbo, which

4     has not yet occurred.  That production was due to be exchanged

5     with the defendant's productions on May 30th, as per the

6     Court's scheduling order, which was entered into approximately

7     a month after Mr. Frisch filed his notice of appearance.

8          I had understood from Dumbo's prior counsel that all

9     of Dumbo's documents had been reviewed and were with the

10    e-discovery vendor since at least late 2024.  Mr. Frisch

11    confirmed that the documents were with the discovery vendor,

12    but there was a payment issue.  Dumbo apparently had not paid

13    the vendor, and therefore the vendor would not release the

14    documents.  I've gotten various representations from Mr. Frisch

15    regarding payment.  Ultimately, he represented in early July

16    that Dumbo had paid the vendor fully and, as of July 14th, that

17    he had access to the documents from the vendor.

18          Dumbo purported to make a production of these

19    documents on July 15th, but that production was deficient in

20    several material ways.

21          One, there were numerous irrelevant documents, that

22    had been flagged as irrelevant, and to be removed from

23    production by Dumbo's counsel, but because that relevancy

24    review apparently was done on a different document review

25    platform than the discovery vendor had, the documents produced

P7MCpieC

initially still included all these irrelevant documents.  And

that's important to eliminate because I understand from

Mr. Frisch that there are approximately 90 to 100 gigs of data

that he's going to be producing, which could be more than

100,000 documents.  So eliminating irrelevant documents would

obviously save the parties considerable time and effort.

            Also, the production that Mr. Frisch initially made

was not in compliance with the Court's ESI protocol.  Various

important files were missing and over 22,000 documents had

errors.  So even my litigation support personnel tried to load

those documents onto our platform to review — it wasn't

possible to do so.

            I understand from Mr. Frisch he is aware of these

issues.  He is apparently trying to ameliorate these problems

and produce the right documents in compliance with ESI

protocol; however, I have not gotten a definitive date by which

the documents would be produced.  Mr. Frisch has told me it

could take several weeks to provide the full production.  Given

that we're now coming to the end of July and this exchange was

supposed to have been made at the end of May, waiting two or

potentially three months after the required exchange is

prejudicial to the defendants.  So I'm looking for some relief

from the Court to ensure that the documents will be produced

without the irrelevant materials, and at a date certain as soon

as possible.

P7MCpieC

1          THE COURT:  Mr. Frisch.

2          MR. FRISCH:  Yes, your Honor.  Okay.  So some of that

3   is 100-percent accurate.  Certainly there were issues with

4   payment.  And Mr. Perkins was aware of this issue when we --

5   when we discussed the schedule.  I said to him, look, I'm -- I

6   don't know that we're going to have them by May 30th.  My

7   client did not have the money.  The document review cost around

8   $100,000, and they were paying it down.  And there was some --

9   so they have in fact paid it down.  As Mr. Perkins said, I had

10  sent him the entire ESI production without anything that had

11  been called.  I was hoping that there would be a very large

12  calling, I don't think it's going to be as large as we had

13  hoped because I don't think as many of the documents had been

14  in fact reviewed for relevance by prior counsel.  So he's going

15  to get a large production.

16          I am working with the vendor, which whom I have no

17  prior relationship, so it isn't easy for me to push them.  I

18  expect to have a production of the first batch today or

19  tomorrow.  And then they said because of the size of what's

20  left, it will take a few days, but it is in process to, you

21  know, we will get it to him as soon as we can.  It is -- and

22  I've given them the protocol to make sure the metadata is in

23  accordance with the protocol.  So I do believe that we will

24  have production today or tomorrow.  I will follow up with them.

25  I was supposed to hear from her again last night at the end of

P7MCpieC

```
1    the day, but I didn't, so I will follow up after this call to
2    find out a schedule, but then we will begin producing on a
3    rolling basis.  I don't think it's going to take weeks, maybe a
4    week and a half, two weeks.  I was trying to get a sense --
5    like I said, this was not my vendor.  And I don't think they
6    like Dumbo very much because they did wait a long time for
7    money.  So I don't know how much -- I don't have a lot of
8    influence, but I am trying to push them along to get this
9    production out the door.
10           THE COURT:  So Mr. Perkins, it looks as though that
11   you'll start getting your documents sooner than later.
12           MR. PERKINS:  Yes.
13           THE COURT:  So in light of that, I don't know that
14   there's anything for me to do.  I don't know that it would be
15   useful, for example, for anyone to engage in any motion
16   practice with respect to this.  It sounds like Mr. Frisch is
17   aware of the issues, is doing what he to get you the documents
18   as soon as possible under, I suppose, somewhat difficult
19   circumstances given the history with this vendor.  But unless
20   you see anything different, I don't know that there's anything
21   for me to do, other than to impress upon Mr. Frisch the
22   importance of getting this done as soon as possible.
23           Which I assume, Mr. Frisch, you have received that
24   message, correct?
25           MR. FRISCH:  I've had that message and I've been -- I
```

P7MCpieC

```
 1    have been pushing Dumbo to get it -- to get it paid, and I've

 2    been pushing the vendor.

 3               It's just a matter of -- when they gave me access to

 4    it, they sent me a drive.  I was delayed -- I was away for a

 5    week on vacation, which the drive was waiting in FedEx for me

 6    when I got here.  The, you know, so, like, when I got to it --

 7    and then I got a system that I've never used and -- and I was

 8    like, okay, now I need to talk to someone because I don't know

 9    I'm looking at at all and I didn't know how to use it.  So, you

10    know, so that's -- that is sort of the, you know, the slow

11    down.

12               And I think Mr. Perkins is well aware of a lot of

13    this.  I mean, he was -- he hasn't been super aggressive, which

14    I appreciate.  I think he was aware, through June, that we were

15    trying hard to get it.  And I think, you know, your Honor, you

16    understand this is a big, complex case that I jump in, you

17    know, relatively recently I feel like.  So I am trying very

18    hard to push my guys to get what they need to get done done so

19    that the case can move forward.

20               THE COURT:  Okay --

21               MR. PERKINS:  Your Honor --

22               (Indiscernible crosstalk)

23               Yes, your Honor.  I understand and accept Mr. Frisch's

24    representations and agree that a motion for sanctions and other

25    relief would be premature given what he is representing.
```

P7MCpieC

1          I would ask for a definitive date by which the

2    production will be done because I'm concerned that a production

3    could drag out over a long time, and there's already been a

4    long time.  We have been patient, we have met and conferred

5    with Mr. Frisch extensively.

6          I did not bring this motion lightly, but I do want to

7    point out, your Honor, as I'm sure you're aware, if Dumbo has

8    financial problems, that should not be an impediment of

9    defendant's ability to conduct discovery in this matter.  We

10   should not be delayed because Dumbo does not want to allocate

11   necessary resources to the prosecution of this case by paying

12   its vendors as required to release documents.  That should not

13   be defendant's issue.  Therefore, I think it is time for the

14   Court to say, A, if you want to go forward with this case,

15   produce your documents by X date.

16          THE COURT:  Mr. Frisch, what --

17          MR. FRISCH:  So while -- I don't really have any

18   problem with it.  I just -- I want to get a realistic date

19   before I say yes to a particular -- to a particular date.  I

20   want to -- I want to, you know, I've -- I need to talk to the

21   vendor and just -- I would -- I would ask if I could follow up

22   with the Court, you know, with an update by letter to let you

23   know exactly when they expect to all of the documents produced

24   so that I can be realistic, and then Mr. Perkins can object if

25   the date is too long, I guess.   I just -- I don't want to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7MCpieC

1    promise anything.  I admit, I may have overpromised Mr. Perkins

2    a couple times based on my client's representations to me, and

3    I feel -- and I feel like he doesn't trust me because of that,

4    and I don't blame him because there were times where our client

5    said things that were not 100-percent accurate.  So I'd rather,

6    before speaking and saying, yes, I'm going to be done in

7    exactly a week and a half, everything is going to be out to

8    him, I would rather speak with the vendor today and just say

9    when -- give me a date when you can have everything produced

10   and I let the Court know.  And then if Mr. Perkins thinks that

11   that's too long, then let him make his application.

12           THE COURT:  Okay.  So by Thursday, Mr. Frisch, you'll

13   report back to the Court?

14           MR. FRISCH:  Will do.  By letter, Judge?

15           THE COURT:  Yes.

16           Okay.  Mr. Perkins --

17           MR. FRISCH:  And, your Honor --

18           THE COURT:  I'm sorry.  Mr. Perkins, you said -- I'm

19   sorry.

20           (Indiscernible crosstalk)

21           You said there were a couple of other matters that you

22   needed to discuss?

23           MR. PERKINS:  Yes.  Thank you.  And I apologize for

24   interrupting your Honor.

25           There are.  And I guess as to the letter, I assume

P7MCpieC

1  that if I feel the need to respond or clarify our position in

2  response to Mr. Frisch's letter, I can do so; is that correct,

3  your Honor?

4          THE COURT:  Absolutely.

5          MR. PERKINS:  Thank you.

6          The next issue relates to the operational software,

7  which was also supposed to be exchanged on May 30th.  I do have

8  a somewhat positive report on that, and that the parties were

9  able to exchange access to operational software or purportedly

10  operational software yesterday.  The delay, as I understand it,

11  was due to Dumbo's apparent willingness or unwillingness to

12  produce software with test data.

13          And the reason why test data is important here, your

14  Honor, is neither side wants to produce the actual software

15  they're using with live data because, as your Honor knows that

16  Dumbo alleges in the complaint, Piece of Cake is a direct

17  competitor of Dumbo.  So the parties agreed to produce

18  operational software with test data in it.  Mr. Frisch made

19  various representations, he was working on that, he would

20  provide that.  Then he said, no, I'm not going to provide it

21  with test data.  And then he said, oh, I have some software

22  here and it has test data, I'll give that to you.

23          We have taken a very preliminary look at that, given

24  that we received it yesterday afternoon, and there are some

25  problems, which I noted to Mr. Frisch this morning, which he's

P7MCpieC

1    going to look into.  But the problems are significant.  And I

2    wanted to bring them to your attention because the software

3    that we received is missing certain functionalities.  And as

4    your Honor may recall from prior motion practice, Dumbo claimed

5    various functionalities as their trade secrets in this matter

6    in their amended interrogatory responses which were before the

7    Court on our prior motion.

8            And so among the various functionalities that are

9    missing are several of the functionalities claimed here as

10   trade secrets.  My view is if Dumbo is going to seek to

11   prosecute this claim for trade secrets based upon the alleged

12   functionalities, they need to produce software to the

13   defendants that displays the functionalities that they're

14   claiming are trade secret or they need to eliminate those

15   claimed functionalities from their alleged trade secrets.

16   Dumbo can't have it both ways, claiming certain functionalities

17   as trade secrets, but not provide us with the software in order

18   to analyze and test those functionalities.

19           THE COURT:  Mr. Frisch.

20           MR. FRISCH:  Yes, your Honor.  So, our position on

21   this is -- meaning in terms of what was produced -- I don't --

22   meaning they have the source code, they could load the

23   source -- they could have their expert load the source code and

24   operate the source code in full with those security

25   restrictions.  Because of the way Dumbo was able to provide --

P7MCpieC

1    it's not a test environment, it is a -- an old database that's

2    no longer in use.  But if the permissions are set to

3    permissive, then it would allow them access to other aspects of

4    the software that would include Dumbo's current data.

5            So, based on the way that it's being hosted, there is

6    no -- meaning I -- I've asked to see if there's any way to

7    change it, but that was my understanding after my conversation

8    with my client yesterday because he was actually demonstrating

9    the software to me yesterday, and there was certain things I

10   could not do that he had to do on his end and show me the

11   effect of.

12           But we believe that because, A, they have the source

13   code, which can be loaded on their own, it's fully operational

14   if they want to.  That's how you go from source code to

15   software, right, is their expert could load it on their own

16   computer and then run the software and then they could see

17   everything.

18           And so there was some misunderstanding as to whether

19   or not data was included in this database or not.  When I first

20   looked at it, I did not understand it and I said to him I

21   didn't think there was any data.  And if it turned out there

22   was data, it was just because it was old data and wasn't

23   showing on the front page and I didn't know how to really

24   operate it.

25           So we think that what we've produced, you know,

P7MCpieC

1    they're asking us basically to make something that doesn't

2    currently exist, which is an entirely separate database for

3    them, and we don't think that that's reasonable or necessary.

4    And simply, if they want -- if they want to see a particular

5    functionality, then they should -- they then they should load

6    the software themselves or maybe there's another way -- maybe

7    we could do a demonstration of it in a meeting or something.

8    But to say we have to go and build an entirely new piece of

9    software separate, you know, separate server and make that

10   available with no security restrictions seems unreasonable and

11   unfair and unduly burdensome.

12         THE COURT:  First of all, let me just tell the parties

13   that I have 10 minutes before I have another conference.

14         Mr. Perkins, it sounds like to me that Mr. Frisch is

15   telling me that you're able to do with what has already been

16   produced, but you are complaining about not being able to do.

17   Is there a dispute with respect to that?

18         MR. PERKINS:  Yes, your Honor.  The scheduling order

19   in this matter and the parties have contemplated in the

20   protective order and since the inception of this matter, the

21   discovery, the exchange of source code and the exchange of

22   operational software, whether the source code can be compiled

23   and decompiled in a way that makes it functional is an unknown.

24   And even if that were true, it would be need to then be loaded

25   with test data.  That is a formidable undertaking.  And I don't

P7MCpieC

1    know whether my experts would be able to make this software,

2    based on the source code, functional in the way that the

3    plaintiff is claiming is their trade secrets.  This is a trade

4    secret case and a copyright case.  Dumbo is claiming

5    $20 million of damages.  They want us, the defendants, to

6    review their software to determine whether there are trade

7    secrets that are there — they should make that software

8    available.  We should not have to recreate it or try to

9    decompile source code.  If they can't do that in a test data

10   environment, then they should make the live program available.

11        And I suspect that — and I've asked Mr. Frisch, but he

12   hasn't answered — what Dumbo's expert has reviewed is not the

13   software that was provided to the defendants yesterday, but was

14   live software.

15        So the trade secrets that you have accepted for

16   description at this point is not based on the software that

17   we've received, and we're entitled to the software of which

18   they're using to describe their trade secrets in order to test

19   their trade secrets.  We should not have to recreate it.  I'm

20   not sure what Mr. Frisch is saying, without security

21   restrictions.  The protective order provides very detailed

22   restrictions on who can access the software and the source

23   code.  And none of the parties are able to do so, only

24   attorneys and experts.

25        THE COURT:  It sounds like you folks should continue

P7MCpieC

1    to talk.  Again, as I sit here, I don't pretend to understand

2    exactly what it is you all are talking about.  I don't recall

3    any prior conversations at any prior conference concerning

4    operational software.  But Mr. Frisch was telling me that you

5    can do what you're concerned about doing with what you have,

6    and you're telling me that you cannot.  So continue to talk,

7    and if there is a real dispute about this, then we can talk

8    about another motion.

9              But now we have seven minutes.  Mr. Perkins, you said

10   you had another issue?

11             MR. PERKINS:  Yes.  I'll be very brief, your Honor.

12   The parties have exchanged certain source code.  I've inquired

13   of the plaintiff whether there's any earlier source code, and

14   the plaintiff has produced certain source code that they claim

15   is the earliest source code they have from July '22.  However,

16   what they provided is incomplete and roughly half the code is

17   missing.  Mr. Frisch said he was looking into whether that code

18   exists.  I just wanted a definitive response by a definite

19   date.  Does such earlier source code exist in full?  And if so,

20   can it be produced?  If not, I will just note that Dumbo is not

21   able to provide thus far the source code from the time that it

22   filed its copyright registration and from the time that it

23   claimed that the software that was subject to the copyright

24   registration was complete.

25             THE COURT:  Mr. Frisch.

P7MCpieC

1          MR. FRISCH:  Well, we produced all the source code

2     that we have in our possession, including the source code that

3     was for the copyright registration.  There are -- the source

4     code is divided up into different components.  So the piece

5     from 2022 includes, I think, the primary database component,

6     but there are certain other components that are not included.

7     As of now, nobody located it.  So I can say, based on my

8     conversations with my client and the expert witness, that

9     they -- that we don't have it.  I can't say that something

10    won't, you know, as with everything, I can't say that they

11    won't say they found it later.  Obviously, at some point,

12    they'll, you know, they'll be stuck with their answers on this.

13    As of now, this is what we have located and it's been provided.

14    What he has is what we have.

15          THE COURT:  Okay.  Well, there's your answer --

16          MR. PERKINS:  Thank you, your Honor.

17          THE COURT:  Yes.  Mr. Perkins.

18          MR. PERKINS:  Yes.  Your Honor, I appreciate that

19    Mr. Frisch can only provide what he says he can provide, but

20    this is a critical piece of the plaintiff's copyright claim,

21    and I just would like a definitive answer.  I don't want the

22    possibility that, four months from now, some additional code

23    will turn up.  Either they have that code or they don't.  He's

24    represented this is the earliest code that they have.  So if

25    they have that in additional pieces, they should provide it by

P7MCpieC

1  a date certain, and if not, then they don't have it.  But I

2  don't want this continuing ambiguity to interfere with

3  defendant's ability to conduct discovery in this matter.

4          THE COURT:  Mr. Frisch.

5          MR. FRISCH:  I don't think we've been ambiguous.  As

6  of now, we don't have anything further to give.  I did check

7  with the client and the expert yesterday to make sure nothing

8  was in their possession that I didn't have.  As of now,

9  nothing -- we don't have it.  I don't expect -- I don't expect

10 it to turn up.  You know, I mean, the only answer is sometimes

11 during depositions, people say, oh, yeah, I remember, oh, I

12 forgot something, you know.  So it -- things get turned up over

13 through the course of litigation.  I know I'm not going to

14 accept a, you know, I'm not going to say I want to accept a bar

15 date, you know, if it turns up later at this juncture because I

16 think we have been working hard to locate everything and we

17 have given all the source code that we have, and I think he can

18 rely on the representation that, as of now, there is nothing

19 else.  Obviously, if -- if something turns up, he can make any

20 application he -- he wants about whether or not it should be

21 barred, but that's a pretty -- it's a pretty drastic remedy, I

22 think, on these facts..

23         THE COURT:  I think I tend to agree, Mr. Perkins.  You

24 have your representation.  If it happens that they come up with

25 something in the future, you can make an appropriate

P7MCpieC

1    application to preclude.

2              Anything else that we need to do today --

3              MR. FRISCH:  By the way --

4              MR. PERKINS:  Yes, your Honor --

5              THE COURT:  Yes.  Was that Mr. Perkins?

6              MR. FRISCH:  No, it's Mr. Frisch.

7              THE COURT:  Who?

8              MR. FRISCH:  Mr. Frisch.  I have something to say on

9    their document productions, Judge, which is every single

10   document of both defendant's document production has been

11   marked as attorneys' eyes only, which seems out of -- out of

12   whack with my prior experience, but also out of whack with your

13   order that says designations should be done minimally and not,

14   you know, and not, you know, en masse.  I've objected to

15   Mr. Perkins on this, and, you know, and his response is,

16   basically, it's a trade secrets case, so everything is

17   attorneys' eyes only, but I don't -- I don't -- I've been

18   looking, you know, as I've started my review, I'm seeing a lot

19   of old emails that really don't relate to very much and, you

20   know, it's just -- it's a huge burden for every single document

21   to be attorneys' eyes only.

22             THE COURT:  Mr. Perkins.

23             MR. PERKINS:  Mr. Frisch has misrepresented what my

24   position is on this case.  I have made clear to Mr. Frisch that

25   under the protective order, I'm quoting, a receiving party may

P7MCpieC

1    request in writing to designate (technical interruption) a

2    designation given to any designated material be modified or

3    withdrawn.  I told Mr. Frisch if there are any particular

4    documents he believes could not be deemed attorneys' eyes only,

5    to bring them to our attention and we're happy to review it.  I

6    did not say just because this is a trade secret case everything

7    should be marked attorneys' eyes only.  What I said is that

8    documents relating to the development of Piece of Cake's

9    software and documents that are dealing with competitive

10   issues, those are very confidential and should be withheld as

11   attorneys' eyes only because we would not want Dumbo to get

12   access to any information that could be of competitive value.

13   The fact that these emails are several years old does not make

14   them stale.  We're talking about software from 2022 and 2023,

15   and these emails relate to the development of Piece of Cake's

16   software at the same time.

17          So we've taken the prudent measures that we felt were

18   appropriate.  If there are particular documents Mr. Frisch

19   disagrees about, he's free to send them to me for my review.

20   There's a mechanism in the Court's order to address that.

21          MR. FRISCH:  Well, your Honor, I just feel like, you

22   know, that's shifting the burden on what should be a limited,

23   limited designation into you go over everything and then -- and

24   then tell me which -- which view I think, you know, aren't

25   attorneys' eyes only.  I don't think any of them are attorneys'

P7MCpieC

1    eyes only from what I've looked at so far, which is limited --

2            THE COURT:  I've got to stop you guys.  Mr. Frisch, if

3    there are particular documents that you feel are inhibiting

4    your ability to prosecute this case, speak to Mr. Perkins about

5    that.

6            Ms. Baigalmaa, I didn't mean to ignore you, but I

7    assume that you are concurrent with what Mr. Perkins has said

8    in this conference; is that correct?

9            MS. BAIGALMAA:  Correct, your Honor.

10           THE COURT:  Okay.  With that, we are adjourned.  Be

11   well.

12                            *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25