# Exhibit D



Fred H. Perkins<br>
Partner<br>
(212) 735-8647<br>
fhperkins@morrisoncohen.com

August 4, 2025

**VIA EMAIL**
Avram E. Frisch
1 University Plaza Dr, #119
Hackensack, NJ 07601

      Re:      <u>Dumbo Moving & Storage, Inc. ("Dumbo") v. Piece of Cake Moving & Storage LLC ("POC") et al, 1:22-cv-05138 (the "Litigation")  -- RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL</u>

Dear Avi:

      Defendants and their experts have now had an opportunity to preliminarily examine the "operational software" Dumbo has produced for examination and inspection (the "Produced Dumbo Software") and the produced purportedly complete source code for the Dumbo software dating from 2023 (the "Dumbo 2023 Source Code").  As explained below, there are numerous material deficiencies with the Produced Dumbo Software that prevent Defendants from examining and analyzing Dumbo's alleged trade secrets as purportedly described in Schedule A to Dumbo's First Amended Responses to POC Defendants' Second Set of Interrogatories (the "TS Description").  Furthermore, given the enormous volume of source code that Dumbo has identified in its TS Description as allegedly embodying its trade secrets, Defendants and their experts need a further refinement of Dumbo's alleged trade secrets identification to enable them to fully understand the scope of Dumbo's trade secrets as identified in the TS Description.  Counsel for Defendant Plokhykh joins in this letter and the requests made herein.

      **<u>Dumbo Software Deficiencies</u>**

      As you are presumably well aware, Dumbo described 16 "functionalities" of its "software" (including various subparts) that it contends comprise its 12 alleged trade secrets allegedly misappropriated in the Litigation. (See TS Description, Sched. A). Dumbo included in its TS Description various screen shots from its software, which it contends "illustrate" or are "exemplary" of its alleged trade secrets.  (*Id*.).

      Dumbo's disclosed expert, Ross Malaga, stated the following to be true under penalties of perjury in his September 27, 2024 Declaration (ECF 144/145) ("Malaga Dec."):

- Dumbo "claims the functionality generating these screenshots [in the TS Description] is what is protected."
- The "screenshots" included in the TS Description "certainly defines and illustrates the relevant trade secrets to the defendants."

**Morrison Cohen**

Avram Frisch    RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 2

- "These screen shots" in the TS Description "are 'clearly' exemplary" and "will change based on the device being used, device settings and the specific data being displayed."
- "[T]hese screen shots serve the intended purpose of providing further detail placing Defendants on notice of the trade secrets Dumbo alleges have been misappropriated by the Defendants."
- "[T]he screen shots provide additional details that supplement the narrative description of each trade secret."

(Malaga Dec. ¶¶ 12-14).

The Court in denying "without prejudice" Defendants' motion to compel Dumbo to provide a more detailed description of its alleged trade secrets explicitly observed that Dumbo's amended interrogatory responses containing its current TS Description were amended to include "illustrative screenshots of key features" of Dumbo's alleged trade secrets and "Dumbo's narrative descriptions of twelve alleged trade secrets, **combined with illustrative screen shots and specific source code references, put Defendants sufficiently 'on notice' of the nature of Dumbo's claims.**" (ECF 152 at 6, 8, & 12) (emphasis added).

Despite the highlighted importance of the screen shots from Dumbo's software in illustrating the functionalities Dumbo claims constitute its alleged trade secrets in its TS Description, the Produced Dumbo Software fails to put Defendants "on notice" of the alleged trade secrets because many of the claimed trade secret functionalities and the "exemplary" screen displays are not present or appear materially different than what Dumbo has purported to describe in its TS description. Indeed, it is telling that you conceded that Mr. Malaga "hasn't looked at [the Produced Dumbo Software] yet." (July 15, 2025 email from A. Frisch to F. Perkins). **This confirms that the version of software Dumbo used to create the screen shots included in its TS Description and regarding which Mr. Malaga declared would illustrate and put the Defendants on notice of the "details" of the alleged trade secrets is NOT the same as the Produced Dumbo Software provided to Defendants for their review and analysis.**

It is therefore not surprising that Defendants' experts, despite their expertise and best efforts to do so, were unable to reproduce – using the Produced Dumbo Software – the screen shots purportedly illustrative of Dumbo's trade secrets as alleged in the TS Description. For example, the following screen shots from Dumbo's TS Description could not be reproduced using the Produced Dumbo Software – compare left column from the TS Description with right column from the Produced Dumbo Software:



Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 3




Avram Frisch  
August 4, 2025  
Page 4

RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL





Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 5



Morrison Cohen LLP | 909 Third Avenue | New York, NY 10022-4784 | P 212.735.8600 | F 212.735.8708 | morrisoncohen.com



Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 6





Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 7

Obviously, if the Produced Dumbo Software cannot actually display the illustrative screen shots that were purportedly supposed to provide additional details of Dumbo's alleged trade secrets and put Defendants on notice of what Dumbo is claiming, then the Produced Dumbo Software is deficient and cannot serve its intended purpose – as Dumbo alleged and the Court relied upon in its decision – of illustrating Dumbo's alleged trade secrets.

More fundamentally, when Defendants' experts sought to recreate the various trade secret functionalities claimed in the TS Description through use of the Produced Dumbo Software, the following alleged trade secret features (claimed in the TS Description) was missing in the Produced Dumbo Software: Dumbo's alleged trade secrets A.2  D ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ E ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ F ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and I ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Equally disturbing, the full functionality alleged by Dumbo as its trade secret was absent in the Produced Dumbo Software for **all** functionalities asserted in the TS Description **except** for A.3, B.4, C, G, and K. In addition, there appears to be insufficient data in the Produced Dumbo Software that would enable Defendants to examine these missing alleged functionalities, even assuming the asserted trade secret feature was present in the Produced Dumbo Software: A.1, A.2, B.1, B.2, B.3, B.4, D, E, F, H, I, J & L.

While I know you have previously suggested that Defendant could use the Dumbo 2023 Source Code to generate fully operational software, that is incorrect for several reasons. First, trying to use such code to make a fully operational software system is a formidable and time-consuming task which by no means is guaranteed to be successful. Without internal developer documentation, build instructions, environment setup details, version dependencies, etc., the recreation of a working system based only on such source code essentially becomes guesswork, even for sophisticated experts. Further, Defendants' experts are unaware of the precise conditions under which the source code was intended to run (e.g., the specific configurations, 3rd-party services and dependencies, APIs, etc.). Second, even if that could be done – by Dumbo, for example – it would have no data in such software and therefore, once again, the functionalities Dumbo has asserted constitute its trade secrets in its TS Description would not be visible even if all of the alleged trade secret features were theoretically present.

Similarly, your previous suggestion of having Defendants' experts add data to the Produced Dumbo Software is also flawed and problematic. As shown above, there are at least five alleged trade secret functionalities not present in the Produced Dumbo Software. Thus, simply adding random data will not make such non-existent features automatically appear. In addition, not only is adding potentially useful data manually (which is the only way it can be done give the current configuration and access provided to the Produced Dumbo Software) a labor-intensive and time-consuming task, Defendants' experts are not aware of precisely what data needs to be added and where. Only Dumbo allegedly knows how to configure its software so as to reproduce the images that Dumbo used to define their trade secrets. Defendants do not have the specific information and configurations necessary to recreate the images Dumbo claims illustrate its alleged trade secrets.



Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 8

Without the proper type of data in the proper data tables and fields, Dumbo's software will still not likely run properly and will not be able to be properly examined and analyzed for its alleged trade secret functionalities. It is not Defendants' burden to guess and expend time and effort to try to make Dumbo's alleged trade secret software work in the manner it claims constitutes its trade secrets, it is Dumbo's burden as plaintiff to do so if it seeks to pursue a trade secret claim.[1]

Accordingly, we request that Dumbo produce the **actual software used to create the screen shots contained in the TS Description and referred to the Malaga Dec. and the Court's decision** or agree that it cannot claim any of the alleged functionalities as trade secrets that are not fully viewable and cannot be properly examined and analyzed in the Produced Dumbo Software.

**Dumbo Source Code**

As you are presumably aware, Mr. Malaga represented to the Court in his declaration that: "Once this [source code] exchange takes places [sic], a person with reasonable skill in software design and engineering, such as Mr. Walker holds himself out to be, will be able to evaluate the files and directories identified by Dumbo and fully understand the scope of Dumbo's trade secrets identified in Dumbo's Schedule A." (Malaga Dec. ¶ 9). Quoting and relying on this representation by Mr. Malaga, the Court explicitly ruled in its decision that: "**If Defendants are nonetheless unable to 'fully understand the scope of Dumbo's trade secrets as identified in Dumbo's Schedule A,' [citing to the Malaga Dec. ¶ 9], Defendants can seek further refinement of Dumbo's trade secrets identification, such as by asking Dumbo to narrow its source code references**." (ECF 152 at 16) (emphasis added).

For your information, there are a total of 370,715 lines of source code contained in 3,394 source code files in the Dumbo 2023 Source Code. Now that Defendants' experts, including Dr. Walker, has had an opportunity to preliminarily examine such code, they have determined that Dumbo identified 176,988 lines of source code in 1,433 unique files in the TS description as constituting its alleged trade secrets. **By identifying nearly 50% of all of the code and files contained in the Dumbo 2023 Source Code as allegedly constituting Dumbo's trade secrets, such an over-inclusive, broad-brush approach clearly does not identify Dumbo's alleged trade secrets with reasonable particularity.** Dumbo cannot reasonably expect Defendants' experts, who are unquestionably skilled in software design and engineering, to spend hundreds and hundreds of hours hunting through nearly 177,000 lines of code in over 1,400 computer files to try to "fully understand the scope of Dumbo's trade secrets." No matter how skilled Defendants' experts are, they cannot discern the alleged trade secrets purportedly specified in the TS Description by reviewing nearly 177,000 lines of code. Rather, it is Dumbo's burden -- not Defendants' -- under applicable law to identify with reasonable particularity the alleged trade secrets. Indeed, as one circuit court observed: "plaintiff must do more than just identify a kind of

---

[1] Even if Defendants' experts knew precisely the right data to add and exactly where, Defendants' work product in so doing is inherently compromised as the Produced Dumbo Software and any data added by Defendants would be – as you have confirmed – available for all to see and use, thereby compromising the sanctity of their work product and providing such work product to Dumbo at no cost.



Avram Frisch  RESTRICTED CONFIDENTIAL SOURCE CODE MATERIAL
August 4, 2025
Page 9

technology and then invite the court [and defendants] to hunt through the details in search of items meeting the statutory definition." *IDX Systems Corp., v. Epic Systems Corp*., 285 F. 3d 581, 584 (7th Cir. 2002).  Of course, if Dumbo seriously contends that all 177,000 lines of code it has identified are required to specify its trade secrets with particularity, then any software implementation that does not conform to the entirety of the 177,000 lines cannot by definition misappropriate the alleged trade secrets at issue.

Accordingly, as the Court directed in foreseeing the possibility of this precise circumstance, we are requesting that Dumbo materially narrow its source code references in the TS Description to the particular files and specific lines of code that Dumbo contends actually constitutes its alleged trade secrets.

I look forward to hearing from you as soon as possible and am available at any mutually convenient time later this week to meet and confer regarding the above issues.  Naturally, this letter is without waiver of any of Defendants' rights and remedies, all of which are hereby reserved.

Sincerely,

*Fred H. Perkins*

Fred H. Perkins

FHP/mle

Enclosures

cc:     Wing Chiu, Esq.